## UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | : CHAPTER 7 |
| SALVATORE CARBONE | : |
| | : CASE NO. 18-13403-elf |
| DEBTOR | : |
| | : |
| GARY SEITZ, ESQUIRE | : |
| CHAPTER 7 TRUSTEE | : |
| PLAINTIFF | : ADVERSARY NO. 19-00068-elf |
| v. | : |
| SALVATORE CARBONE, WENDY | : |
| CARBONE, RAYMOND CARBONE, | : |
| CATHY BIRD SIKORA , | : |
| CARBONE BROTHERS, L.P. | : |
| BUILDER PROS CONSTRUCTION LLC: | |
| BUILDER PROS CONTRACTORS LLC : | |
| DEFENDANTS | : |
| | : |

## PLAINTIFF'S POST TRIAL MEMORANDUM

Plaintiff Gary Seitz, Esquire, the Chapter 7 Trustee (the "Trustee" or "Plaintiff"), files

this Post Trial Memoradum following the Trial on May 20, 2021 and May 21, 2021.  The

Defendants in the case are Salvatore Carbone ("Sal"), Wendy Carbone ("Wendy"), Raymond

Carbone ("Ray"), Cathy Bird Sikora ("Sikora"), Carbone Brothers, L.L.P. ("Carbone Brothers"),

Builder Pros Construction, LLC ("Builder Pros 1")  and Builder Pros Contractors, LLC ("Builder

Pros 2").

## I.    INTRODUCTION

This matter is before the Court pursuant to an adversary proceeding commenced by the

Trustee in the bankruptcy case of Salvatore Carbone (the "Debtor").  Since the inception of this

case, the collective defendants have played a shell game with the Trustee regarding the

disclosure and the production of evidence.  The Trustee was forced to file motion after motion to

obtain documents that were clearly at the defendants' disposal or could have easily been obtained.  The defendants knew that documents from Harleysville Bank, Erie Insurance, and Citizen's Bank were extremely damaging to their core defense that Carbone Brothers ceased to exist after 2009, and had nothing to do with the construction of either properties at Mt. Kirk and Sellersville.  That is why the defendants opposed every discovery motion that the Trustee was forced to file.

Each time the Trustee uncovered a new piece of evidence, the defendants changed their story. When the Trustee obtained the Carbone Brothers' bank account statements and deposit slips from Harleysville Bank, the defendants then changed their story to Carbone Brothers had "effectively" ceased operations in 2009 and was only doing plowing work.  Sikora even claimed at her deposition upon direct questioning by her attorney that she never heard of Carbone Brothers prior to 2018, and testified definitively at her deposition that she never had a contract with Carbone Brothers to build Mt. Kirk.  When the Trustee filed a Motion to subpoena Citizen's Bank after the Trustee discovered that the bank financed the construction of Mt. Kirk, Sikora opposed the Trustee's motion.

Sikora knew that Ray, Sal, Bruno and Carbone Brothers were sued in 2009 in Montgomery County by their principal creditor Antonucci.  Facing an extensive judgment, the defendants ensured that any creditor could not get to their assets.  Sal formed Builder Pros 1 with Carbone Brothers' assets, and then he along with Ray and Sikora diverted the Citizen's Bank payments to Builder Pros 1.  They did this almost immediately before the  Montgomery County Trial Judge ordered the creditor's case in the trial pool.  In February of 2017, when the Montgomery County Court of Common Pleas entered a verdict for over $450,000 in favor of the creditor and against Sal, Ray Bruno, and Carbone Brothers, Sal three weeks later incorporated

Builder Pros 2 and then claimed that his wife, a nanny with no construction experience, was running the construction business, and that he was only making $1,000 as a soccer coach.  If Sal was not concerned about the creditor's litigation and ultimate judgment, then then there was no reason to twice incorporate a new construction company.  Sal could have simply went on using Carbone Brothers, as he was extensively using its bank account anyhow for his personal needs.

The shell game was extensive, but it slowly unraveled despite the defendants' subterfuge. This Court, as the finder of fact, should now hold the defendants accountable for the fraudulent transfers that they perpetrated to place valuable assets outside the reach of their creditors.

## II.     THE TRIAL

### A.     SCOPE

The trial centered around the Trustee's Amended Complaint which attacked the construction of two homes on empty lots by Sal, Ray and Carbone Brothers, which were identified as being in Lower Providence Township ("Mt. Kirk"),  and Sellersville Borough ("Sellersville").  The Trustee brought four counts against the defendants that included actual and constructive fraud under 11 U.S.C. §548(a)(1)(A) and (B), (Counts I and II), and actual and constructive fraud under the Pennsylvania Uniform Fraudulent Transfer Act. 12 Pa.C.S.A. § 5101 *et seq.* (PUFTA) (Counts III and IV). In addition, the Trustee sought to pierce the corporate veil of Carbone Brothers and Builder Pros 1 in Count V of the Amended Adversary Complaint. The Trustee sought to avoid the transfers made by the defendants pursuant 11 U.S.C. § 548(a)(1) and 11 U.S.C. § 544(b) of the Bankruptcy Code.  With respect to the Trustee's claim under § 544(b), the Trustee invoked the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa.C.S.A. §§ 5101– 5110 ("PUFTA") as the applicable nonbankruptcy law.

The Bankruptcy Code grants the trustee exclusive statutory authority to bring claims to recover property fraudulently transferred by the debtor for the benefit of all creditors. Sections 544(b) and 548(a) grant the trustee broad avoidance powers under federal law. 11 U.S.C. §§ 544(b), 548. Section 550 gives trustees sweeping recovery rights to collect fraudulently transferred property. The purpose of these provisions is to give a trustee authority to recover fraudulent transfers on behalf of the estate and for the benefit of all creditors. *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.),* 226 F.3d 237, 243 (3d Cir. 2000) (holding that to fulfill their duty to creditors, trustees "have a variety of statutorily created powers, known as avoidance powers, which enable them to recover property on behalf of the bankruptcy estate").

The plain language of §550(a) allows this Court, in its discretion, to award the Trustee "the value of [the] property" fraudulently transferred, and not the profit from the construction of the two homes as defendants contend. For Mt. Kirk, the entire $306,000 was diverted from Carbone Brothers to Sal.  As far as Sellersville, the entire $250,000 should be the measure of the damages as was absolutely clear the value of the consideration received by Sal, which was nothing, was not the reasonably equivalent  value of the construction services rendered to build the house.  There was no evidence of expenses presented at trial by Sal for the construction of the two homes.  The only evidence before this Court at trial was the amount of money that Sal ultimately received. Had these Citizen's Bank funds remained in Builder Pros 1, they would have been subject to attack by the creditor once judgment was entered by the Montgomery County Court of Common Pleas.

PUFTA provides for compensatory damages pursuant to Section 5108(b), which states that "to the extent a transfer is voidable in an action by a creditor under section 5107(a)(1) . . . ,

the creditor may recover judgment for the value of the asset transferred, as adjusted under

subsection (c), or the amount necessary to satisfy the creditor's claim, whichever is less." 12

Pa.C.S.A. § 5108(b).  Here, the value of the assets transferred is less than the amount necessary

to satisfy the creditor's claims, which is for approximately $450,000, so the judgment must be

for the value of the assets transferred.

 The purpose of fraudulent conveyance law is to make available to creditors

those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have

been transferred away." *Buncher Co. v. Official Comm. of Unsecured  Creditors of GenFarm*

*Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000). To this end, Congress has established a

statutory framework by which transfers may be deemed fraudulent, and thus avoided by

bankruptcy trustees.

### B.  ALL DEFENDANTS HAVE JOINT AND SEVERAL TORFEASOR LIABILITY

 Sikora seemed to argue at trial that could not be liable under PUFTA because she was not

a "transferee".  That is not correct. Joint and several liability can be imposed under §550 where a

person who did not "actually directly receive the transferred property… nevertheless indirectly

receive[d] it or receive[d] its proceeds **or value**." *Mack v. Newton*, 737 F.2d 1343, 1358 (5th

Cir. 1984)(emphasis added).  That conclusion is mandated by the plain language of §550, which

expressly allows a trustee to recover the value of fraudulently transferred property not only from

the initial transferee, but also from any subsequent transferees who did not take in good faith and

anyone "for whose benefit such transfer was made." 11 U.S.C. §550(a); *Boyer v. Belavilas,* 474

F.3d 375, 378 (7th Cir. 2007) (debtor's wife who "exercised dominion" over

fraudulently transferred funds, routing them to companies she and her husband controlled,

was liable under §550(a) as a person for whose benefit the transfer was made even though she

never held title to the funds); *Friedman v. Luengo*, 104 B.R. 489, 490-91 (Bankr. S.D. Fla. 1989) (a trustee is entitled to a joint and several judgment where the transfer was made for the benefit of multiple entities).

Caselaw in this Circuit holds that Sikora is a joint tortfeasor under PUFTA and therefore, a judgment may be entered against her for the value of a fraudulent transfer even though she never received any portion of the fraudulently transferred proceeds.   Sikora has joint and several liability which is an available remedy in fraudulent transfer cases. *In re Blatstein*, 260 B.R. 698, 720 (E.D. Pa. 2001) (applying Pennsylvania law and its version of the PUFTA). In particular, joint tortfeasors or those acting in concert with one another are jointly responsible for each other's conduct.   *In re Blatstein*, 260 B.R. at 720.

More recently. the United States District Court for the Eastern District of Pennsylvania held that joint tortfeasor liability applied  under PUFTA in *Impala Platinum Holdings Limited et al., .v. A-1 Specialized Services and Supplies, Inc*. (2017 WL 2840352, U.S. District Court E.D. Pa. Mar. 10, 2017). The  District Court rejected the argument that under PUFTA, "the debtor-transferor is the sole tortfeasor, and there are no joint tortfeasors," which the Court noted was contrary to precedent.  42 Pa.C.S.A. § 8322 defines "joint tortfeasor" as "two or more persons jointly or severally liable in tort for the same injury to persons or property, whether or not judgment has been recovered against all or some of them."   The Court the following cases that stood for this proposition: *In re Blatstein,* 260 B.R. 698, 720-21 (E.D. Pa. 2001) for the proposition that "PUFTA provides for joint and several liability."; *Schwartzman v. Rogue Intern. Talent Grp., Inc*., No. 12-5255, 2014 WL 4055833, at *3 (E.D. Pa. Aug. 13, 2014), *Titus v. Sheare*r, 498 B.R. 508, 522 (W.D. Pa. 2013), and *In re Arbogast*, 466 B.R. 287, 307 (Bankr. W.D. Pa. 2012) (for the same proposition).

6

The District Court  in *Impala Platinum Holdings Limited* held that since

a fraudulent transfer under PUFTA is a tort, then it follows that where the actions of more than

one individual combine "to cause a single harm which cannot be apportioned, the actors

are joint tortfeasors even though they may have acted independently." *citing*, *Baker v. AC&S,*

*Inc.*, 729 A.2d 1140, 1146 (Pa. Super. Ct. 1999).

Further, the District Court held that there is nothing in PUFTA that prevents the Court

from finding that the individual defendants were joint tortfeasors.[7] And, "if parties

are joint tortfeasors, they are 'jointly and severally liable' to the plaintiff for his or her

injuries." citing, *Blatstein,* 260 B.R. at 720 (quoting *Baker v. AC&S, Inc*., 562 Pa. 290, 300 (Pa.

2000)).

The District Court specifically noted that Impala's theory of the case was that the

individual defendants colluded to perpetrate a fraudulent scheme and that they all played a role

in its execution. Sufficient evidence was introduced to support the jury's finding that the

individuals acted jointly in making the transfers that were deemed fraudulent.

That is exactly the Trustee's theory and what happened in the case at bar.

## C.  SIKORA, RAY AND SAL COLLUDE TO DIVERT THE PAYMENTS FROM CARBONE BROTHERS TO SAL

The facts at trial revealed that Ray had been dating Sikora since 2009, and both planned

to live together at Mt. Kirk with Sikora's children.  Sikora knew Sal and Wendy well and had a

social relationship with them.  In April of 2014, Ray was evicted  from his house at  3 Gina

Circle following a foreclosure in the matter of First Niagara Bank v. Raymond Carbone, CCP

Bucks 2013-02596. Ray obviously had no credit and instead, Sikora purchased an empty lot at

45 W. Mt. Kirk Avenue, Lower Providence Township ("Mt. Kirk").   Ray, as a partner and on

behalf of Carbone Brothers,  had Sikora execute a contract dated May 17, 2014, with Carbone

Brothers to build a house on the empty lot.  (the "Carbone Contract")[1]

Up until this Court permitted the Trustee to subpoena Citizen's Bank, Sikora and Ray

steadfastly and under oath denied the very existence of any contract with Carbone Brothers:

```
        Q.      So, you didn't have any contract
  with Carbone Brothers?
        A.      Correct, I didn't have a contract
  with them.                                            [2]
```

In fact, Sikora disingenuously claimed, upon direct questioning by her own counsel, to

not  have even heard of Carbone Brothers prior to the Trustee instituting this litigation:

```
        Q.      Had you ever heard of Carbone
  Brothers before this litigation started?
        A.      No, because I met Ray in 2009.
        Q.      Did you know that -- so, really,
  you essentially first heard of it when this

  litigation started?
        A.      Yes.
        Q.      And to your knowledge, did Ray
  Carbone have affiliation with Carbone Brothers
  after you met him?
        A.      No.                                     [3]
```

Despite this false testimony, Sikora admitted at trial that she and Ray signed the contract.

for Carbone Brothers to build the house at Mt. Kirk. (the "Carbone Brothers Contract"). As a

general partner, Ray possessed the authority to bind the general partnership  under the

Pennsylvania Uniform Partnership Act of 2016,15 Pa.C.S.A. § 8431 [4]

---

1 Exhibit 26, Citizens 190-194, Adobe pg. 1-6
2 Exhibit 27, Sikora deposition pgs 27; 48
3 Exhibit 27,  Sikora deposition pgs. 119-120
4 The former Uniform Partnership Act, Chapter 83 of Title 15, was repealed in 2016 and replaced by Act
of November 21, 2016 (P.L. 1328, No. 170). See, now, Chapter 84 of Title 15.

The Contract specifically provided that Sikora was to pay Carbone Brothers $306,000 to build Mt. Kirk, that Sikora was to obtain the necessary permits, that Sikora was to provide Carbone Brothers with a Certificate of Insurance, and that Sikora was to obtain a construction loan to pay for the construction. Importantly, the contract was non-assignable except in writing signed by both parties. There was no writing between the parties to evidence that Sikora agreed to an assignment to any entity other than Carbone Brothers. Under Pennsylvania law, non-assignment clauses are valid. See *Western United Life Assurance Co. v. Hayden*, 64 F.3d 833, 841 (3d Cir. 1995).

As part of its contractual obligation, Carbone Brothers provided a price schedule to Sikora in order for her to obtain the construction loan (the "Carbone Brothers Pricing").[5] Sikora then submitted the Carbone Brothers Contract and the Carbone Bothers Pricing to Citizen's Bank in order to obtain a construction loan.

During discovery, and playing her shell games, Sikora intentionally produced an unsigned HUD-1 that she claimed represented the closing of her construction loan. It was intended to mislead because no payments to Carbone Brothers was reflected on the HUD-1.[6] However, Citizen's Bank produced the actual, signed HUD-1 that showed that Carbone Brothers was paid a draw of $30,600 at closing. [7] This draw paid by Citizen's Bank at closing matched one of the line item draws on the Carbone Brothers Pricing and also, Citizen's Bank register tape that was produced via subpoena which noted "Deposit Bldr HUD-1":

---

[5] Exhibit 26, Citizen's 219, Adobe pg. 6
[6] Exhibit 5, Sikora 76
[7] Exhibit 26, Citizen's 114, Adobe pg. 9-12



8

In addition to being paid this draw at closing, Citizen's Bank reflected that Carbone Brothers was paid  a final draw of $13,770, which Ray signed off as the general contractor for Carbone Brothers.[9]

Sikora knew that Ray, Sal, Bruno and Carbone Brothers had been sued by the creditor John Antonucci in Montgomery County. In fact, the trial Judge on September 17, 2014 ordered the case into the trial pool for November 17, 2014.[10]  Certainly, Ray and Sal knew even prior to this date that the case was headed to trial.  Sikora, Ray, and Sal, knew that Carbone Brothers could not get paid under the Carbone Brothers Contract and concocted a scheme to divert the construction loan proceeds away from Carbone Brothers and the reach of the creditor.

On June 28, 2014, less than three weeks prior to the permits being issued by Lower Providence to Carbone Brothers, Sal removed money from the Carbone Brothers Bank Account to form Builder Pros 1.[11]   As the work started in August or September of 2014,[12]  Ray and Sikora signed off on payment requisitions to Citzen's Bank.[13]  The Court queried why the builder, Sal, never submitted the requisitions to the bank for payment, and Ray gave a feeble explanation that he was "helping out" Sikora.

---

8 Exhibit 26, Citizen's 230, Adobe pg 14
9 Exhibit 26, Citizen's 207, Adobe . 17
10 Exhibit 31
11 Exhibit 8-Carbone 362, Adobe pg. 44
12 Exhibit 27, Deposition of Cathy Sikora pg. 55
13 See, e.g., Exhibit 26, Citizen's 204, Adobe pg 16

On these requisitions, Ray identified himself as Project Manager for Builder Pros 1 and inserted the bank account number at First Niagra Bank for Builder Pros 1.[14]  On the final Completion and Acceptance Letter, from Citizen's Bank, where it paid the final sum of $13,700, Ray identified himself as the contractor, and not Builder Pros 1[15].  Citizen's assumed that it was dealing with the Carbones, which is the only logical explanation as to why the bank would pay anyone other than Carbone Brothers.  The bank payments should have been made to Carbone Brothers as there clearly was no assignment of the Carbone Brothers Contract.  In total, all $306,000 of the money intended for Carbone Brothers was diverted to Builder Pros 1.

In order to receive a building permit, insurance was required under the Carbone Brothers Contract and it was Sikora's responsibility to provide the insurance.  In 2014, Paulette Finney testified in her deposition and at trial that only Carbone Brothers had an active $1,000,000 Five Star Contractor's Policy with Erie to cover any construction work.[16] However, Ms. Finney testified that Ray told her that Carbone Brothers was "sold" on July 31, 2014.[17]  This enabled Sal to have Erie issue a builder's risk policy to cover the construction work.  Ms. Finney testified that on  September 30, 2014, Sal applied for a builder's risk policy from Erie Insurance to cover the construction at the Mt Kirk, and Sal filled out the application in the presence Ms. Finney and stated on the application that he was "doing business as" Builder's Pro.[18]

As further evidence of their deception, Sikora produced an unsigned proposal from Builder Pros 1 that was dated June 25, 2014, two days after Lower Providence issued the

---

14 See, e.g., Exhibit 26, Citizen's 204, Adobe pg 16
15 Exhibit 26, Citizen's 204, 206,  and 249.
16 Exhibit 23, Adobe pg. 104 (deposition exhibit Carbone 32)
17 Exhibit 23, Adobe pg. 106 Carbone 34; deposition Paulette Finney, pg 29
18 Exhibit 15, Adobe pg. 10, Carbone 86

construction permits to Carbone Brothers.[19]  However, Sikora never signed the proposal, [20] did

not know who prepared it, could not testify how she obtained it, and could not testify that she

saw the proposal prior to the construction at Mt. Kirk. [21]  Amazingly, Sal produced this proposal

during discovery in this case despite Sal's testimony in the Montgomery County litigation that it

was common practice for Carbone Brothers to not document costs when they built a house:

> Q.    Okay.   Now, as Carbone Brothers went
> forward and built a house on a lot, would
> there be documents created as part of that
> process; invoices, bills?
> A.    Invoices for?
> Q.    Anything related to the actual
> construction of a structure.
> A.    No.
> Q.    There wouldn't be invoices?
> A.    (Witness shakes head).                    [22]

Sal was able to extraordinarily document the costs for Mt. Kirk *after* the construction

was completed.

Sal could not testify as to how he built Mt. Kirk as Builder's Pro 1 owned no assets.[23]  On

the other hand, Carbone Brothers owned equipment that it employed in its construction business.

The partnership return for 2009, Form 1065, line 26, showed that Carbone Brothers owned

equipment such as a Kobota Tractor, Tag along, and various trucks.[24]

---

19 Exhibit 5, Sikora 73.
20 Exhibit 27, Deposition Cathy Sikora, pg 49
21 Exhibit 27, Deposition Cathy Sikora pgs 53-54
22 Exhibit 19, pg 25
23 Exhibit 10, testimony Sal Carbone at the 341 meeting pg 13.
24 Exhibit 21, Adobe pg. 13 of 15

No receipts, invoices, or contracts with any subcontractors, were produced to show that Builder's Pro incurred any costs of construction. Sal could not name one subcontractor, produce any invoices, certificates of insurance, and/or canceled checks to any subcontractor and claimed that, at least in some instances, he paid cash.[25]  As an example of his evasiveness, Sal incredibly testified that he "flagged" down a construction crew on the road to do the excavation work at Mt. Kirk:

> Q.  Who did the excavation?
> A.  I can't remember.  It was an excavation crew I flagged down on the side of the road working on another project and they dug it out for me and backfilled.  I can't remember who it was.
> Q.  Wait a minute.  You said you flagged down an excavation crew working on the road?
> A.  Well, yes, because I would cruise by construction sites and I'd see someone working, and sometimes to get contacts for certain things I would ask them to bid the work, because it's very difficult to find construction help.
> Q.  Can you give me a name?
> A.  For the excavation crew? I don't know.  [26]

On April 13, 2015, Ray met with Lower Providence Code Inspections and claimed that Carbone Brothers was the general contractor and doing the work at Mt. Kirk. [27] On April 28, 2015, Lower Providence Township issued a Temporary Certificate of Occupancy to Sikora and specifically identified the permit holder as "Carbone Brothers, LLP".[28]   The Certificate stated that pursuant to §403.46(d) of the Township Code, a building code official may suspend or revoke the certificate if it was based on incorrect information. At no time did Sikora,  Ray or Sal

---

25 Exhibit 28, deposition of Sal Carbone pg. 66
26 Exhibit 28, deposition of Sal Carbone pg. 52
27 Exhibit 14, Adobe pg. 25
28 Exhibit 14, Adobe pg. 16

inform anyone at Lower Providence that Carbone Brothers was not the general contractor doing the work on the Mt. Kirk House.[29]

The Trustee also presented the testimony of Bruce Lazar, appraiser hired by Citizen's Bank, to show that Carbone Brothers Contract was not at arm's length and substantially undervalued.  Mr. Lazar testified that he appraised the lot improvements for Citizen's Bank on June 17, 2014, which was prior to the construction.[30]  The appraised the cost of the improvements using a cost approach was $406,324 (the empty lot was appraised at $100,000):

| OPINION OF SITE VALUE | | | | =$ | 100,000 |
|---|---|---|---|---|---|
| DWELLING | 3,148 Sq.Ft. @ $ | 108.00 | | =$ | 339,984 |
| BASEMENT | 1,336 Sq.Ft. @ $ | 30.00 | | =$ | 40,080 |
| | | | | =$ | |
| Garage/Carport | 542 Sq.Ft. @ $ | 30.00 | | =$ | 16,260 |
| Total Estimate of Cost-New | | | | =$ | 396,324 |
| Less          Physical | Functional | External | | | |
| Depreciation | | | | =$( | ) |
| Depreciated Cost of Improvements | | | | =$ | 396,324 |
| "As-is" Value of Site Improvements | | | | =$ | 10,000 |
| | | | | | |
| INDICATED VALUE BY COST APPROACH | | | | =$ | 506,324 |

F (not required by Fannie Mae)

Using an income approach, Mr. Lazar arrived at the appraised cost of the improvements at $450,000.[31]

Therefore, the evidence showed that Sikora did not pay the reasonably equivalent value for the construction services, which again, were not at arm's length.

---

29 Exhibit 29, deposition Ray Carbone pg 46, Exhibit 28, deposition Sal Carbone pg. 52.
30 Exhibit 26, Citizen's 166, Adobe pg 22
31 Exhibit 26, Citizen's 169, Adobe pg 25

### D.  SIKORA, RAY AND SAL CONTINUE THEIR SHELL GAME AT SELLERSVILLE

About the same time that Sikora acquired the vacant lot in Lower Providence, Sikora also acquired vacant lots in Sellersville Borough. [32]  In her Rule 26 Disclosures and at trial, Sikora claimed to be the general contractor who built Sellersville:[33]

> 2.      Builder Pros Construction was the contractor on Mt. Kirk. With respect to Sellersville, Ms. Sikora acted as the contractor and occasionally engaged a few subcontractors from time to time.  However, she does not have records relation to that currently in her possession.  Neither Carbone Brothers nor Builder Pros Construction had anything to do with Sellersville.

The two vacant lots were consolidated into one lot numbered as 260 Elmhurst, and the deed description prepared by Cowan Associates, Sellersville's engineers, described it as a "Carbone Brothers Property".[34]  Sikora hired Borusiewicz & Co. and architect, Michael DiCicco, to prepare the engineering and architectural plans, respectively, to submit to Sellersville Borough.[35]  Both described Sellersville as a "Carbone Brothers Property." Submissions were made by Sikora to the Bucks County Conservation District and the Commonwealth of Pennsylvania, both of which described Sellersville as a  "Carbone Brothers Property."[36] At all times, the Sellersville Borough Code inspectors met only with Carbone Brothers[37]  and issued an Earth Disturbance Report and referenced the property as a "Carbone Brothers Property."[38]

On February 21, 2014, Sikora authorized Ray to file a building permit application for Carbone Brothers to construct Sellersville.[39] Ray informed Sellersville Borough that Carbone Brothers was the contractor and that the estimated cost of construction was $165,000.[40] Ray also

---

32 Exhibit 27, deposition Cathy Sikora pg. 78
33 Exhibit 7
34 Exhibit 17(g), Adobe pg. 8
35 Exhibit 17(h) and 17(i) and (j)
36 Exhibit 18(d)  and 18(b)
37 Exhibit 29, deposition of Ray Carbone pg 62
38 Exhibit 18, Adobe pg. 1.
39 Exhibit 17(a), Adobe pg. 2
40 Exhibit 28, deposition of Ray Carbone Exhibit 17

informed Sellersville Borough Manager David Rivet that he was using the Carbone Brothers'
insurance so that he could obtain the construction permit:

> Q.    How did Mr. Rivet know or how did
> Sellersville know to list Carbone Brothers as the
> contractor?
> A.    As the applicant who applied for the
> permit? Like as I stated before, for the sole
> purpose of obtaining a building permit, I used
> the Carbone Brothers' insurance information in
> order to apply for this permit, knowing that
> whoever ultimately did the contracting would also
> have a license or an insurance policy in place.    [41]

Sellersville Borough issued the construction permit, number 1877, to Carbone Brothers
on June 10, 2014. [42]

A Sellersville Code officer met with Carbone Brothers and inspected the footing and the
foundation on December 2, 2014, and December 29, 2014, respectively.[43] At no time did Sikora
or Carbone Brothers inform Sellersville Borough or the Commonwealth of Pennsylvania that
Carbone Brothers was not the contractor.

On July 18, 2015, Cowan Associates noted on the Inspection Report that the Construction
permit had expired as of June 15, 2015.  On July 14, 2015, Cowan Associates wrote to Sikora
and informed her that she immediately had to renew the construction permit. [44]  Sikora testified
that she went to the Borough to renew the permit.  Sikora told the Borough that Carbone
Brothers was the contractor and the Borough issued Permit 1877-EXTENSION with an
expiration of August 24, 2016, was issued specifically issued to Sikora.[45]  At no time did Sikora
advise the Borough that she was the contractor and that the permit was wrong.

---

41 Exhibit 28, deposition of Ray Carbone pg 59
42 Exhibit 17( c), Adobe pg. 4
43 Exhibit 17 (f), Adobe pg. 7
44 Exhibit 17( e), Adobe pg. 6
45 Exhibit 17(d), Adobe pg. 5

Again, as evidence of their deception, Sal testified that Builder Pros 1 had no

involvement with Sellersville:

> ***
>
> your company, Builder Pro Construction,
> LLC, did either you or your company have any
> involvement with the construction of the
> Sellersville property at 260 Elmhurst Avenue?
> A. No. [46]

Similarly, in their Rule 26 disclosures par. 2, all of the defendants claimed that neither

Carbone Brothers or Builder Pros had anything to do with Sellersville.[47] In fact, Sal testified that

he had not even seen the Rule 26 Disclosure:

> Q. Look at Paragraph 2. And I'm going to
> 6 represent that this is a Rule 26 disclosure that
> 7 was sent on March 24, 2020. Have you seen this
> 8 email prior to today?
> 9 A. I don't think so.[48]

Sal told Paulette Finney that he was working at Sellersville, that the cost of construction

was $250,000, and instructed Ms. Finney to transfer the builder's risk policy from Mt. Kirk to

Sellersville.[49] In fact, like the construction at Mt. Kirk, all three partners of Carbone Brothers

worked at the Sellersville.[50] However, there is no record of any payment by Sikora to Carbone

Brothers (or to any other entity) to construct the Sellersville House:

> A.      I don't know anything about that.
> Q.      Are you aware that Erie Insurance
> issued a builders risk policy to construct
> Sellersville with the named insured as Builders
> Pro construction, LLC?
> A.      No, I don't know that.
> Q.      Did you issue personal checks to

---

46 Exhibit 28, deposition Sal Carbone pg. 94
47 Exhibit 7
48 Exhibit 28, deposition Sal Carbone pg. 95
49 Exhibit 15, Carbonne 77-80
50 Exhibit 28, deposition of Ray Carbone pg. 63

```
pay any contractors or subcontractors, I should
say, at Sellersville?
     A.     Maybe.
     Q.     What do you mean maybe?
     A.     I'm sure I did.  I paid a lot in
cash.
     Q.     You gave cash to the contractors?
     A.     A lot of it I did, yes.
     Q.     Where was the cash coming from?
     A.     My account.
     Q.     Which account?
     A.     My safe deposit box, I kept cash
in there.
     Q.     Do you know how much cash in total
you paid the contractors or subcontractors?
     A.     No.
     Q.     Do you know how much in total you
paid any of the contractors to construct
Sellersville?
     A.     No, I don't know.
     Q.     When you issued cash or paid cash
to these subcontractors, did they give you back
a receipt?
     A.     No.
```
                                                            51

Final inspection of the Sellersville House took place between Carbone Brothers and

Sellersville on Aust 22, 2018.[52]   Sikora has possession of Sellersville but does not reside there.[53]

The Sellersille house is vacant, and has been vacant since its completion in 2018. Sikora

admitted it was an investment property.  Sikora is obviously waiting for this matter to conclude

before she sold Sellersville for a substantial profit.   Sikora should have paid Carbone Brothers,

or ultimately Sal at least $250,000 which was the cost that Sal represented to Erie Insurance to

construct Sellersville. There was no evidence of any expenses to build Sellersville, so the entire

$250,000 is the reasonably equivalent value of the services that Sikora should have paid Sal to

build Sellerville.

---

51 Exhibit 27, deposition of Cathy Sikora at pg. 108-109
52 Exhibit 17(f), Adobe pg. 7
53 Exhibit 27, deposition of Cathy Sikora, pg 13.

### E. CARBONE BROTHERS, BUILDER PROS 1 AND 2 SHOULD BE COLLAPSED AS SAL'S ALTER EGO

All of the evidence and testimony pointed to Sal building the two homes.   The Trustee asserted that Carbone Brothers and Builder Pros 1 and Builder Pros 2, should be collapsed and all monies for the construction of the two homes attributable to Sal.    The evidence also showed that Carbone Brothers, and Buider Pros 1 and 2 were controlled by Sal as his personal checkbook; commingling was rampant.  Sal was one course shy of earning a B.S. in Accounting.  He certainly knew what he was doing.

In his Chapter 7 schedules and testimony at the 341 Meeting,[54] pleadings[55], and Rule 26 disclosures,[56] Sal Carbone claimed that Carbone Brothers ceased to exist after 2009.   The pleadings and memoranda even asserted that Carbone Brothers was a limited partnership when both Ray and Sal testified that it had lost its "LLP status".[57]  The evidence, however, showed that Carbone Brothers was in fact a general partnership with Sal as the general partner.[58]   Carbone Brothers had no partnership agreement, and Sal kept its books and records. [59]

Carbone Brothers functioned as Sal's personal pocketbook.  The Harleysville Bank statements and the deposit slips[60] showed that Carbone Brothers had an active bank account at Harleysville Bank from 2013 to 2017 ("Harleysville Account"), with deposits totalling over $250,000.   The bank deposit slips from the Harleysville Account showed that both Ray and Sal made deposits into the account from 2012 to 2016 totaling $165,547.50.[61]  Partnership tax

---

54 Exhibit 10, pg. 14
55 See, e.g., Exhibit 2, par. 6, 19, Seventh Affirmative Defense
56 Exhibit 7
57 See, e.g., Exhibit 28, pg. 29
58 Exhibit 21, Forms K-1 attached to the return
59 Exhibit 30.3, pgs. 141-142
60 Exhibits 8 and 9, respectviely
61 Exhibit 9, Carbone 405-427

returns were not filed by Carbone Brothers despite Carbone Brothers doing business, in violation of Federal and Pennsylvania law.[62]

Ray testified that after 2013, Sal was using the Harleysille Account for his personal expenses. All three partners had check signing authority over the Harleysville Account after 2009.[63] Ray, Sal and Bruno were depositing into the account and commingling personal funds. Thus, when Sal needed to pay his personal expenses, he simply withdrew from the Harleysville Account despite having a personal joint account with his wife.  Sal paid for his personal expenses from the Harleysville Account such as Netflix, liquor store purchases, Dick's Sporting Goods, Delaware Vacation Rentals, Kayak rentals, Las Vegas Fashion Shows. Sal testified at trial that in hindsight, he should not have done it.   By using the Harleysville Account as his personal checkbook, Sal kept these funds beyond the reach of his creditors. *Main II*, 213 B.R. 67, 91. (Bankr. E.D. Pa. 1997).

The evidence showed that Carbone Brothers never closed in 2009, but continued to operate. As late as 2017, Carbone Brothers had an active contractor's license with the Commonwealth of Pennsylvnia.[64] No Out of Existence/Withdrawal Affidavit was filed with the Commonwealth of Pennsylvania that withdrew Carbone Brothers from the Department of Revenue's records.

In 2014, Ray was using Carbone Brothers' plowing equipemnt and a truck that was insured by Erie Insurance.  Carbone Brothers was sued in Montgomery County and Paulette Finney testified that Erie Insurance paid the claim a Carbone Brothers was the insured under the

---

62 26 CFR § 1.6031(a)-1; 72 P.S § 7335(c)
63 Exhibit 29, Deposition of Ray Carbone, pg 26
64 Exhibit 10, pg. 30

policy.[65]  Ray signed pleadings and verifications in 2016 in that litigation and claimed that Carbone Brothers was the proper party defendant. [66]

There is no question that Carbone Brothers never "effectively ceased" operations and that it was a general partnership.  Therefore, Bruno, Sal and Ray as general partners[67] had joint and several liability for all debts, obligations and other liabilities of the partnership. 15 Pa C.S.A. §8436 (2016).  Under Pennsylvania law, a partner is individually liable for wrongs committed by the partnership. *LaFountain v. Webb Indus. Corp.*, 759 F. Supp 236, 242 n.3, aff'd, 951 F.2d 544 (3d Cir. 1991).

The evidence shows that Builder Pros 1 and Builder Pros 2 were alter egos of one another, dominated by Sal Carbone, and justification exists to disregard their separate existence and treat them as one for the following reasons:

a.      Sal withdrew $374 from the Carbone Brothers Bank Account on June 18, 2014[68] to pay Incfile to incorporate Builder Pros 1 one month after Sikora signed the Contract[69] and three weeks before Lower Providence issued the construction permit[70];

b.      Sal is the sole member of Builder Pros1 and it was formed to receive the funds from Mt. Kirk;

c.      Sal testified at his 341 Meeting that he was not doing any business under Builder Pros 1, yet he earned income under Builder Pros 1 in 2018 and had his brother Ray issue a 1099 to him personally; this income was never reported on his bankruptcy schedules;[71]

---

65 See also, Exhibit 23, pg 31.
66 Exhibit 12
67 Ray testified that Carbone Brothers "lost" its LLP status.  Exhibit 29, Deposition of Ray Carbone pg. 79
68 Exhibit 8, Carbone 362
69 Exhibit 26
70 Exhibit 14
71 Exhibit 3

     d.     Sal stopped using Builder Pros 1 in 2018 and had at least one client's contract, Malvern School, switched to his wife's company Builder Pros 2;

     e.     Sal used Carbone Brothers to obtain all of the permits and the Certificates of Occupancy from Lower Providence and Sellersville[72];

     f.     Sal created a "proposal" from Builder Pros 1 in 2015, not prior to any construction at Mt. Kirk,  to make it appear that Carbone Brothers was not involved in the construction[73];

     g.     Carbone Brothers insured the work at Mt. Kirk until Sal switched it to Builder Pros Construction after Ray told Paulette Finney that Carbone Brothers had been sold;

     h.     Sal signed Erie Insurance documents as "d/b/a" Builder Pros 1

     i.     Sal used different iterations of Builder Pros 1 and Builder Pros 2 in order to confuse any creditors;

     j.     Sal could not produce any contracts, invoices, payments or any evidence that Builder Pros 1 did any work at Mt. Kirk;

     k.     Paulette Finney testified that Erie Insurance was told that Builder Pros 1 was building the Sellersville House so that Sikora could obtain insurance;

     l.     Carbone Brothers had active insurance in 2014 when the Mt. Kirk House began construction, and its trucks were insured by Erie Insurance under Carbone Brothers

Perhaps the most compelling reason to collapse the companies is that Sal, twice incorporated a new business when the Montgomery County Court of Common Pleas ruled in the creditor's case against them.  As previously noted, Sal took funds from the Harleysville Account and had Incfile incorporate Builder Pros 1 only weeks before the Trial Judge ordered the

---

72 Exhibits 14 and 17
73 Exhibit 5, Sikora 70

creditor's case into the trial pool.  The second was when the verdict came down on Februay 23,

2017, and the Hon. Maurino Rossanese awarded the creditor the amount of $456,860.52. Sal

again used Incfile to incorporate Builder Pros 2 on March 29, 2017,[74] and claimed that his wife

was now running the construction business.

 If the creditor's lawsuit had not been ordered in the trial pool and judgment entered, there

would have been no reason for Sal to not continue to operate as Carbone Brothers.  Sal was using

the Harleysville Account anyhow, so the only plausible explanation is that Sal was trying to

evade his creditor by putting assets out of reach.

 There was clear indication that Sal was running Builder Pros 2, and not his wife, Wendy.

Sal testified at this 341 meeting of creditors that he was hands on with Builder Pros 2:

> MR. CARBONE:  Pretty much the same as
> my business was, you know, clients would call. I
> would be pretty much hands-on with her business
> as well.  I would day-to-day operations help her
> run her business, people would call, there'd be
> clients that would call for jobs, decks,
> additions, and we would bid them together and I
> would -- sometimes I would do the work and
> sometimes she would sub it to other people.   [75]

 Wendy is a nanny.  She had no construction experience.  Moroever, assets from Builder

Pros 1 were clearly transferred to Builder Pros 2 for no consideration.  As an example, Builder

Pros 1 claimed that it placed  a 2013 GMC Sierra into service on 4/1/2017. [76] However, that

same vehicle was being insured by Erie Insurance under Carbone Brothers.[77]  When asked how

she acquired the asset or what she paid, Wendy had no answer.  As another example of Sal's

---

74 Rebuttal Exhibit 1
75 Exhibit 10, pg 24.
76 Exhibit 32, Adobe pg 48 line 26, which was the 2017 depreciation schedule for Builder Pros 2, Form
4562
77 Exhibit 23, Adobe pgs 97 and 98, Carbone 254 and 256

subterfuge, invoices from the Malvern School showed only "Builder Pros, LLC" in order to cause deliberate confusion and make it appear Builder Pros 1 was still the contractor. [78]

The Superior Court of Pennsylvania stated that a court will not hesitate to treat as identical the corporation and the individuals owning all its stocks and assets whenever justice and public policy demand and when the rights of innocent parties are not prejudiced thereby nor the theory of corporate entity made useless. See *Good v. Holstein,* 787 A.2d 426, 430 (Pa. Super.2001). Stated differently, the corporate form will be disregarded when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime. See *Good v. Holstein*, 787 A.2d at 430 (Pa. Super.2001).

A limited liability company such as Builder Pros 1 is subject to the same veil-piercing principles that apply to corporations. *Advanced Tel. Sys., Inc. v. Corn-Net Prof 1Mobile Radio, LLC,* 846 A.2d 1264, 1281, n.11 (Pa. Super. Ct. 2004). The Pennsylvania Superior Court has recognized that Pennsylvania's "Limited Liability Company Law of 1994 contemplates 'that in the appropriate case the doctrine of piercing the corporate veil will be applied to a limited liability company.'" *Id.* (citing 15 Pa.C.S. § 8904, Committee Comment, 1994). *See also Walmsley v. Ehmann,* 646 A.3d 828, slip op. at 14, 17 (Pa. Super. Ct.) ("[V]eil-piercing principles apply to limited liability corporations."), *appeal denied,* 53 A.3d 758 (Pa. 2012); *In re Gigliotti,* 507 B.R. 826, 833 (Bankr. E.D. Pa.) ("Piercing the corporate veil may be imposed on limited liability companies."), *affd,* 619 F. App'x 200 (3d Cir. 2015); *Guzzi v. Morano,*7 2013 WL 4042511, at \*7 (E.D. Pa. Aug. 8, 2013) (theory applies equally to limited liability companies); *Partners Coffee Co., LLC v. Oceana Servs. & Prods. Co.,* 700 F. Supp. 2d 720, 736 (W.D. Pa. 2010) ("Pennsylvania courts have found that the veil of an LLC may

---

[78] Exhibit 25

be pierced to the same degree as that of a corporation."; *In re LMcD. LLC,* 405 B.R. 555, 560-61

(Bankr. M.D. Pa. 2009) (veil-piercing doctrine applies to LLCs, noting that "[d]espite the

flexibility of a limited liability company, the members are still required to adhere to some

formalities in running a limited liability company"). Moreover, courts applying Pennsylvania law

have pierced the company veil of limited liability companies. *See Klein v. Weidner,*[8] 2010 WL

571800, at *10 (E.D. Pa. Feb. 17, 2010) (piercing corporate veil of LLC under Pennsylvania law

where defendant failed to observe some corporate formalities and "improperly used the LLC

form to perpetrate an injustice" despite that "unlike corporations, LLCs need not observe many

formalities"), *aff'd.* 729 F.3d 280 (3d Cir. 2013); *In re Kitchin,* 445 B.R. 472, 483 (Bankr. E.D.

Pa. 2010) (piercing corporate veil of LLC under Pennsylvania law alter ego theory). *See*

*also Engle v. Matrix Golf & Hosp. Phila., LLC,*[9] 2009 WL 880680, at *3-4 (E.D. Pa. Mar. 31,

2009) (denying defendants' motion to dismiss where plaintiff's allegations, if true, were sufficient

to allow court to pierce corporate veil of LLC under alter ego theory).

      Corporate existence can be disregarded without a specific showing of fraud, illegality or

even wrongdoing. *See Hanrahan v. Audubon Builders. Inc.,* 614 A.2d 748, 753 (Pa. Super. Ct.

1992); *see also, Fletcher,* § 41.10. ("[a]lter ego corporations are not of themselves illegal."). An

alter-ego determination does not require any finding of illegality, only a finding that the lines

between two separate entities or persons have been blurred. Thus, a separate corporate entity can

be "disregarded whenever it is necessary to avoid injustice." *Ragan v. Tri-County Excavating,*

*Inc.,* 62 F.3d 501, 508 (3d Cir. 1995).

      Under Pennsylvania law, "'whenever one in control of a corporation uses that control, or

uses the corporate assets, to further his or her own personal interests, the fiction of the separate

corporate entity may properly be disregarded."' *Ragan v. Tri-County Excavating. Inc.,* 62 F.3d

501, 508 (3d Cir. 1995), *quoting, Ashley v. Ashley,* 393 A.2d 637, 641 (Pa. 1978). As the

The Pennsylvania Superior Court has held that the alter ego theory is applicable where

the individual or corporate owner controls the corporation to be pierced and the controlling

owner is to be held liable." *Good v. Holstein*, 787 A.2d 426, 430 (Pa. Super. 2001) (citation

omitted). "The alter ego theory is available whenever one party seeks to hold the corporation

owner liable for any claim or debt." *Advanced Tel. Sys., 846* A.2d at 1278 (citation and internal

brackets omitted). The Third Circuit Court of Appeals, applying Pennsylvania law, has

considered " reverse piercing*." In re DiLoreto*, 266 Fed.Appx. 140, 142, 2008 WL 227655, *1

(C.A.3 (Pa., 2008)), *In re Blatstein*, 192 F.3d 88 (3d Cir.1999).

The alter ego theory of piercing the corporate veil only applies when the actions and

finances of a company and its owner or owners - be the owner(s) human or other business(es) --

are intertwined to the degree that there is no delineation between the company and the owner(s),

as this Court explained in *Miners , Inc. v. Alpine Equipment Corp.*, 722 A.2d 691 (Pa. Super.

1998). "[T]he alter ego theory which requires proof (1) that the party exercised domination and

control over corporation; and (2) that injustice will result if corporate fiction is maintained

despite unity of interests between corporation and its principal." *Allegheny Energy Supply Co.,

LLC v. Wolf Run Mining Co.*, 53 A.3d 53, 58 n.7 (Pa. Super. 2012) (citation omitted). *In re

Kitchin*, 445 B.R. 472, 481-82 (Bankr. E.D.Pa.2010) (citing cases).

The evidence shows that the Trustee has met both prongs of the above test set forth in the

*Miners* case, and that substantial injustice will result if the separate existence of Builder Pros 1

and Builder Pros 2 are allowed to stand.

If shareholders commingle their assets and affairs with those of their corporations, this factor is given considerable weight toward finding that the corporations are the shareholders' alter egos. *Fletcher,* § 41.30, p. 633 ("Other facts emphasized include ... commingling of corporate and personal assets ...."); *Id.,* § 41.50, p. 700 ("Evidence that shareholders ... mixed personal accounts, or commingled assets so that the ownership interests were indistinguishable, will be *72 weighed, along with other factors, when a disregard of corporate separateness is urged.")

Concurrent with employing alter ego theory,  the Trustee asserts the common enterprise theory also known as the "single entity  theory".  Under this theory, "two or more corporations share common ownership and are, in reality, operating as a corporate combine".  *Miners, Inc. v. Alpine Equipment Corp*., 722 A.2d  691, 695 (Pa. Super. 1998); *Castle Cheese, Inc. v. MS Produce, Inc*., No. 04-878, 2008 WL 4372856, at *32 (W.D. Pa. Sept. 19, 2008) (applying a "single entity" claim in which the plaintiff showed that "in all aspects of their business, the two corporations actually functioned as a single entity and should be treated as such")The relevant factors described by the *Miners* court are "[1] identity of ownership, [2] unified administrative control, [3] similar or supplementary business functions, [4] involuntary creditors, and [5] insolvency of the corporation against which the claim lies." *Miners*, 722 A.2d at 695. See also *Schwab v. McDonald* (*In re LMcD, LLC*)*,* 405 B.R. 555 (Bankr. M.D. Pa. 2009)(considering these factors).

## III.    THE TRUSTEE HAS PROVEN ACTUAL AND CONSTRUCTIVE FRAUD

The Trustee has shown by a preponderance of the evidence that the transfers herein are fraudulent under either an actual or fraudulent transfer theory.  As for actual fraud, a transferor will rarely admit that a transfer was motivated by an intent to hinder, delay or defraud creditors.

Thus, under 11 U.S.C. §548, Courts may infer a defendant's actual intent from circumstantial evidence commonly referred to as "badges of fraud." PUFTA 12 Pa.C.S. § 5104(b) also contain a similar set of indicia of fraud. For constructive fraud under 11 U.S.C. §548(a)(1)(B), the Code sets forth certain requirements.  PUFTA §§ 5104(a)(2) and 5105 contain similar provisions.

Pursuant to Code § 544(b), the Trustee "may set aside any transfer that is voidable under applicable state law[.]" *Bally's Park Place, Inc. v. Rush* (*In re Schaps*), 58 B.R. 581, 584 (E.D. Pa. 1986), a̲ff'd, 815 F.2d 693 (3d Cir. 1987). The state law upon which the Trustee relies is the Pennsylvania Uniform Fraudulent Transfer Act (PUFTA), 12 Pa. C.S. § 5101 *et seq.* Under PUFTA, a "transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset." 12 Pa.C.S.A. § 5101 ("PUFTA").

"The determination of what constitutes a transfer under Section 548 is a question of federal law." *Carmel v. River Bank America* (*In re FBN Food Services, Inc.*), 185 B.R. 265, 271-72 (N.D. Ill. 1995), aff'd and remanded on other grounds, 82 F.3d 1387 (7th Cir. 1996). Section 101 of the Bankruptcy Code defines a "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." 11 U.S.C. § 101(54). "Congress intended the term "transfer" to be as broad as possible. *Besing v. Hawthorne* (*In re Bessing*), 981 F.2d 1488, 1492  (5th Cir. 1993).

PUFTA is designed "to protect creditors from debtors who might try to shelter assets by sham transactions, thereby depriving the creditor of his ability to collect from the debtor." *Bell v. Wyatt*, Civ. A. No. 03-3225, 2005 WL 1522015, at *1 (Pa. Com. Pl. 2005), aff'd, 903 A.2d 39 (Pa. Super. 2006).  PUFTA has a reach back period for transfers of four years. 12 Pa.C.S.A § 5109 ("A cause of action with respect to a fraudulent transfer . . . under this chapter is

extinguished unless [the] action is brought" within "four years after the transfer was made or the obligation was incurred[.]")

The final draw paid by Citizen's Bank to Builder Pros 1 was August 29, 2016, and the final inspection of the Sellersville House took place in August of 2018.  Therefore, the Trustee is well within the statute of limitations to bring the claims against the defendants under either the Bankruptcy Code or PUFTA.

The Trustee can establish the PUFTA claim by demonstrating actual fraud or constructive fraud.  *State Farm Mutual Automobile Insurance co. v. Cordua,* 834 F. Supp.2d 301, 305 (E.D. Pa. 2011).  12 Pa. C.S. § 5104 covers two different types of fraudulent transfers. The first demands a showing of actual intent by the transferee to defraud. *In re Total Containment, Inc*., 335 B.R. 589, 612 (Bankr. E.D. Pa. 2005). The second presumes constructive fraud where plaintiff has established: (1) that the transferor did not receive a reasonably equivalent value in exchange for the debt; and (2) that the transferor's assets were unreasonably small to cover a past or imminent business transaction, or that the transferor believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due. 12 Pa. C.S.A. § 5104(a)(2); see also *Total Containment*, 335 B.R. at 613-14.

PUFTA allows the Court to void an actual fraudulent transfer – i.e., a transfer of assets made "with actual intent to hinder, delay or defraud any creditor of the debtor." 12 Pa. C.S. § 5104(a)(1).   The courts have recognized that "[because] individuals are rarely willing to admit intent, actual fraud is rarely proven by direct evidence." *In re Pa. Gear Corp*., Adv. Nos. 03-940, 03-942, 2008 WL 2370169, at *9 (Bankr. E.D. Pa. Apr. 22, 2008) (citations omitted). Accordingly, the existence of fraudulent intent may be inferred from all facts and circumstances surrounding the conveyance. *U.S. v. Green*, 201 F.3d 251, 256 (3d Cir. 2000).

To prove "actual intent" for purposes of a fraudulent conveyance under section 5104, the

statute allows for consideration to be given to certain "badges of fraud":

> (b) Certain factors.--In determining actual intent under subsection (a)(1),
> consideration may be given, among other factors, to whether:
> (1) the transfer or obligation was to an insider;
> (2) the debtor retained possession or control of the property transferred
> after the transfer;
> (3) the transfer or obligation was disclosed or concealed;
> (4) before the transfer was made or obligation was incurred, the debtor
> had been sued or threatened with suit;
> (5) the transfer was of substantially all the debtor's assets;
> (6) the debtor absconded;
> (7) the debtor removed or concealed assets;
> (8) the value of the consideration received by the debtor was reasonably
> equivalent to the value of the asset transferred or the amount of the obligation
> incurred;
> (9) the debtor was insolvent or became insolvent shortly after the transfer
> was made or the obligation was incurred;
> (10) the transfer occurred shortly before or shortly after a substantial debt
> was incurred; and
> (11) the debtor transferred the essential assets of the business to a lienor
> who transferred the assets to an insider of the debtor.

Not all badges of fraud need be established to prove fraudulent intent." *Pa Gear Corp.*,

2008 WL 2370169, at *10 (citing *In re Computer Personalities Sys., Inc.*, 362 B.R. 669, 675

(Bankr. E.D. Pa. 2006)). Likewise, other factors, beyond the above enumerated "badges of

fraud," can be considered in determining whether a transfer was made with actual intent to

defraud. *C.F. Foods*, 280 B.R. at 109. Finally, "PUFTA does not require proof to set aside a

transfer that the debtor intended to defraud the specific creditor bringing the fraudulent transfer

claim*." In re Blatstein*, 192 F.3d 88, 97 (3d Cir. 1999) (emphasis in original). Intent to defraud

any creditor is sufficient. *Id.*

## A. __THE TRUSTEE'S ACTUAL FRAUD CLAIM__

The Carbone Brothers Contract bestowed certain contractual rights upon the parties,

including the right to receive payments for construction of Mt. Kirk. This is evidenced by

Citizen's Bank having paid, or intended to pay, Carbone Brothers at Sikora's closing of the

construction loan. Had Sal, with assistance from Sikora and Ray, not caused the payments to be

diverted to Builder Pros 1, then $306,000 would have been an asset of Carbone Brothers and be

subject to attack by the creditor.

However, Sal caused Carbone Brothers to be stripped of assets by having the payments

under the Carbone Brothers Contract transferred to Builder Pros 1.  This was accomplished in

part by Ray claiming to have an interest in Builder Pros 1 and signing payment requisitions to

Citizen's Bank as its "project manager".  Sikora went along with this scheme. These payment

rights under the Carbone Brothers Contract were transfers of a property interest. *In Re*

*Sherlock Homes of WNY, Inc.,* 246 B.R. 19 (Bankr. W.D.N.Y. 2000) (stating that listing

contracts between the debtor/broker dealer and prospective sellers bestowed contractual rights

upon the parties and the contract rights were assets of the debtor). There was no valid assignment

of the Carbone Brothers Contract.  To be an effective assignment, the assignor must divest itself

of all right, interest, and control in the property assigned.[12] *Miller v. Wells Fargo Bank Int'l*

*Corp.,* 540 F.2d 548, 557-58 (2d Cir.1976). Therefore, the payments should have been made to

Carbone Brothers.

Moreover, Carbone Brothers should have been paid for construction of Sellersville. Ray

filed legal documents with Sellersville Borough, and its Borough Engineer, Bucks County, and

the Commonwealth of Pennsylvania, that stated that Carbone Brothers was the general

contractor.  Moreover, Carbone Brothers' own architect and engineer that designed Sellersville

and submitted plans to the Borough represented that it was a "Carbone Brothers Property".  Ray

admitted though that all three Carbone Brothers' partners worked at the house.  What is entirely

incredible is Sikora's testimony that she built the house herself and paid cash to subcontractors.

The following badges of fraud are met:

(1)     the transfer of the payment rights from Carbone Brothers to Builder Pros 1 was to an insider, Sal Carbone

(3)     the transfer was clearly concealed, and continued to be concealed in this litigation

(4)     Sal, along with Ray, Bruno and Carbone Brothers, had been sued and the case ordered into the trial pool when Sal established Builder Pros 1 to receive the construction loan proceeds

(5)     the transfer was of substantially all the debtor's assets (Sal claimed that Carbone Brothers was defunct; therefore, the transfer of the $306,000 was substantially all of the income intended for Carbone Brothers

(7)     the debtor Sal removed or concealed assets

(8)     the value of the consideration received by the debtor was not reasonably equivalent to the value of the construction services rendered

(10)    the transfer occurred shortly after a substantial debt was incurred (the transfer occurred during the Montgomery County litigation and prior to a substantial judgment being entered; Sal then established Builder Pros 2 when judgment was awarded on February 17, 2017

In the case at bar, the pleadings, testimony, and the exhibits show that eight of the eleven badges of fraud are met.  While the presence of a single badge of fraud may cast suspicion on a transferor's intent, the confluence of several badges of fraud in one transaction generally provides conclusive evidence that an alleged fraudulent transfer was made with an actual intent to defraud. 11 U.S.C.A. § 548(a)(1)(A); *In re PennySaver USA Publishing, LLC,* 587 B.R. 445 (Bankr. D. Del. 2018); *In re AgFeed USA, LLC*, 546 B.R. 318, 62 Bankr. Ct. Dec. (CRR) 60 (Bankr. D. Del. 2016)

The presence of multiple badges of fraud supports inference that transfer was made with actual intent to hinder, delay or defraud creditors, of kind required by bankruptcy fraudulent transfer statute. 11 U.S.C.A. § 548(a)(1)(A). *In re USA United Fleet, Inc.*, 559 B.R. 41 (Bankr. E.D. N.Y. 2016).

A goodly number of statutory factors, or badges of fraud, considered in determining whether "actual intent" exists, must be proven to support actual fraudulent transfer claim under

either Bankruptcy Code or Pennsylvania Uniform Fraudulent Transfer Act (PUFTA). 11

U.S.C.A. § 548(a)(1); 12 Pa.C.S.A. § 5104(a)(1), (b). *In re Valley Bldg. & Const. Corp.*, 435

B.R. 276, 53 Bankr. Ct. Dec. (CRR) 182 (Bankr. E.D. Pa. 2010). Establishment of

several badges of fraud shows clear and convincing evidence of debtor's actual intent supporting

claim for actual fraudulent transfer. 11 U.S.C.A. § 548(a)(1)(A). *In re TC Liquidations LLC*, 463

B.R. 257 (Bankr. E.D. N.Y. 2011).

### B. TRUSTEE'S CONSTRUCTIVE FRAUD CLAIM

Pursuant to 12 Pa. C.S. §5104(a)(2), a transfer is constructively fraudulent if it was made

"without receiving a reasonably equivalent value in exchange for the transfer or obligation" and

the debtor was then left in a position where he knew he would not be able to pay existing or

future obligations as they came due.

Under PUFTA, "insolvency" is not required to sustain a claim. See *United States v.*

*Rocky Mt. Holdings, Inc.*, 782 F.Supp. 2d 106, 120 n.8 (E.D. Pa. 2011) ("PUFTA does not

require insolvency."); see also *Leibersohn v. Campus Crusade for Christ, Inc.* (*In re C.F. Foods,*

*L.P.*), 280 B.R. 103, 115 n.30 (Bankr. E.D. Pa. 2002) ("[T]he test for constructive fraud under

§5104(a)(2) of PUFTA does not require a finding of insolvency. The transfers can be deemed

constructively fraudulent, even without an analysis of the Debtor's balance sheet solvency.").

"insolvency" is but one of many considerations that may be taken into account when determining

whether a debtor has fraudulently transferred an "asset."

To set aside a transfer under §5104(a)(2), one does not have to prove that the debtor

intended to defraud the specific creditor bringing the fraudulent transfer claim. *Tiab Commc'ns*

*Corp. v. Keymarket of Napa, Inc.*, 263 F. Supp. 2d 925, 934 & n.4 (M.D. Pa. 2003). Rather, this

section allows for the "assumption of fraudulent intent when the debtor makes a transfer or

incurs an obligation without receiving a reasonably equivalent exchange, and the debtor is or is likely to become insolvent." *Bratek v. Beyond Juice*, LLC, Civ. A. No. 04-449, 2005 WL 3071750, at *6 (E.D. Pa. Nov. 14, 2005).

Sikora and Ray intended to build Mt. Kirk as their residence and thus received a substantial benefit in which they failed to pay reasonably equivalent value for the construction services rendered by ultimately Sal.  Also, Sikora received another substantial benefit when Sal built Sellersville, and Sikora failed to pay Carbone Brothers, Sal or Builder Pros 1 anything for the construction.   Sal stated on Erie insurance documents that the cost of construction was $250,000. That should be the measure of damages for Sellersville.

Sikora has no defense as she is not a good faith" transferee under 12 Pa.C.S. § 5108(a). This provision offers an affirmative defense to a defendant faced with a claim of either intentional or constructive fraudulent transfer under §5104. *In re Burry*, 309 B.R. 130, 134-35 (Bankr. E.D. Pa. 2004).  The requisite proof under §5108(a) requires proof of two elements – (1) innocence on the part of the transferee and (2) an exchange of value –which, when raised successfully, defeats both types of fraudulent transfer claims. *Id*. at 135. As this is an affirmative defense, however, the defendants "bear the burden of proof." *Id*. (citing *In re Foxmeyer Corp*., 286 B.R. 546, 572 (Bankr. D. Del. 2002).

The above burden of proof is on the transferee, not the creditor, to meet the above two prongs by clear and convincing evidence. See, 12 Pa. Cons. Stat. § 5108(a); see also Committee Cmt. 1 (stating that the transferee bears the burden of establishing both his good faith and the reasonable equivalence of the consideration exchanged); *Schwartzman v. Rogue Int'l Talent Grp., Inc.*, CIVIL ACTION No. 12-5255 (E.D. Pa. Nov. 7, 2013).

Neither Sikora nor Sal can meet either prong of §5108.  Sal is certainly not an innocent transferee, and Sikora is a joint tortfeasor along with the rest of the defendants.  Sikora fabricated testimony under oath, hid documents, and did not pay reasonably equivalent value for two valuable homes.

Determining whether Sal received reasonably equivalent value in building the two homes is a factual analysis . G*lassman v. Heimback, Spiko & Heckman (In re Spitko)*, 2007 Bankr. LEXIS 2050, at *49 (Bankr. E.D. Pa. 2007) ("Whether the transfer is for 'reasonably equivalent value' in every case is largely a question of fact. . . . In order to determine if a fair economic exchange has occurred in a case of a suspected fraudulent transfer, the bankruptcy court must analyze all the circumstances surrounding the transfer in question."); *see also Satriale v. Key Bank USA, N.A. (In re Burry)*, 309 B.R. 130, 137 (Bankr. E.D. Pa. 2004) (explaining that the reasonably equivalent value analysis is "factual in nature.").

The Third Circuit has held that an analysis requires whether (1) whether any value is received, and (2) whether the value was reasonably equivalent to the transfer made. *In re R.M.L.*, 92 F.3d 139, 152 (3d Cir. 1996). However, whether value was received is viewed from the vantage of the creditor, and not the debtor. *Fid. Bond & Mortg*., 340 B.R. 266, 286 (Bankr. E.D. Pa. 2006).In *Fruehauf Trailer Corp*., 444 F.3d 203, 214 (3d Cir. 2006), the Third Circuit held that if  the benefits the debtor received "are minimal and certainly not equivalent to the value of a substantial outlay of assets," a plaintiff need not prove the exact value conferred because the "amount" of value is then rendered irrelevant.

Courts have set forth a test for determining value and reasonably equivalent value where the services are intangible in nature. In *In re Tower Envtl., Inc.,* 260 B.R. 213 (Bankr. M.D. Fla. 1998), , the court delineated the appropriate two-step analysis when a debtor exchanges cash for

intangible services (such as personal services rendered in the instant dispute): First, the court

must determine whether the debtor received any value at all in exchange for the transfer. The

inquiry in the first step of the analysis is whether the debtor obtained "any benefit ... whether

direct or indirect, without regard to the cost of ... services, the contractual and arm's length nature

of the relationship, and the good faith of the transferee." Second, if it is determined that "value"

was in fact conferred on the debtor as a result of the transaction, the court must then determine

whether that value was reasonably equivalent to the cash transferred by the debtor. In making

this assessment, the court may apply a "totality of the circumstances" test. The totality of the

circumstances test includes the consideration of a variety of factors, such as the fair

market value of the item or service received compared to the price paid, the arms-length nature

of the transaction, and the good faith of the transferee. *Id.; In re R.M.L., Inc.,* 92 F.3d 139, 150

(3d Cir. 1996).

Therefore, there are two separate and distinct steps in

determining value and reasonably equivalent value for purposes of a constructively fraudulent

transfer legal analysis. The first step requires the court to determine whether the transferor

received "any value at all" in the exchange.  *In re R.M.L.,* 92 F.3d at 149. If the court

determines value was conferred, then the court proceeds to

the reasonably equivalent value analysis. *Id.* The law is clear that the district court should not

combine these two inquiries, which are considered separate and distinct. *In re R.M.L.,* 92 F.3d at

149. Further, "the court must make an express factual determination as to whether the debtor

received any value at all" prior to determining whether the value was

"reasonably equivalent." *Id.*

At the risk of being repetitive, Sal received $306,000 for Mt. Kirk although the cost of the improvements according to Bruze Lazar was $406,324.  The Carbone Brothers Contract was not at arm's length, but at the very least the $306,000 should have been paid to Carbone Brothers.  There was no proof of any expenses for Mt. Kirk so the entire amount of these diverted funds, and not the profit earned, were fraudulently transferred.

As for Sellersville, it was clear that neither Carbone Brothers, Builder Pros 1 nor Sal received anything for the construction services to build the valuable investment asset for Sikora. Similar to Mt. Kirk, there was no proof of any expenses incurred.

## IV.    CONCLUSION

For the reasons stated above, the Trustee requests that this Honorable Court enter judgment against the defendants on all Counts of the Amended Complaint as follows:

1) Enter judgment in favor of the Trustee in the amount of $306,000, representing the diverted funds for the construction of Mt. Kirk.

2) Enter judgment in favor of the Trustee in the amount of $250,000 relating to the reasonably equivalent value of the construction services for Sellersville

3) Enter attachments against the property at Mt. Kirk and Sellersville

Respectfully submitted:

*Robert J. Birch*

Dated: June 18, 2021

_____
Robert J. Birch, Esquire
Attorney for the Chapter 7 Trustee

## CERTIFICATE OF SERVICE

I, Robert J. Birch, Esquire, hereby certify that on this 18th day of June, 2021, served a true

and correct copy of the Plaintiff's Post Trial Memorandum of Law via ECF to:

Peter E. Meltzer. Esquire
*Via the email registered with the Court*


_____
ROBERT J. BIRCH, ESQUIRE