## UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE:** | : | **Chapter 7** |
| | : | |
| **SALVATORE CARBONE** | : | |
| | : | |
| | : | **Bky. No. 18-13403 ELF** |
| | : | |
| | : | |
| **GARY SEITZ, Trustee** | : | |
| | : | |
| **Plaintiff** | : | **Adv. No. 19-068** |
| | : | |
| **v.** | :- | |
| | : | |
| **SALVATORE CARBONE,** | : | |
| | : | |
| **WENDY CARBONE,** | : | |
| | : | |
| **RAYMOND CARBONE,** | : | |
| | : | |
| **CATHY BIRD SIKORA,** | : | |
| | : | |
| **CARBONE BROTHERS, L.P.,** | : | |
| | : | |
| **BUILDER PROS CONSTRUCTION LLC,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **BUILDER PROS CONTRACTORS LLC** | : | |
| | : | |
| **Defendants** | : | |

# O P I N I O N

## I.  <u>INTRODUCTION</u>

In this adversary proceeding, Gary Seitz, the chapter 7 trustee ("the Trustee"), seeks to

transform an ostensibly no-asset chapter 7 case into an asset case.

The Trustee has named as defendants several individuals:

(a) the Debtor, Salvatore Carbone (also referred to as "Sal");

(b) the Debtor's wife, Wendy Carbone ("Wendy");

(c) the Debtor's brother, Raymond Carbone ("Ray"); and

(d) Ray's girlfriend, with whom he resides, Cathy Bird Sikora ("Cathy").

The Trustee has also named as defendants three (3) entities, in which various individual

defendants hold an interest:

(a) Carbone Brothers, L.L.P. ("Carbone Bros.");

(b)  Builder Pros Construction, LLC ("Builder Pros-1"); and

(c) Builder Pros Contractors, LLC ("Builder Pros-2").

This adversary proceeding has its genesis in a state court collection action instituted by

John Antonucci in 2009 against Carbone Brothers and its principals, the Debtor, Ray Carbone and

their third brother, Bruno Carbone.  The Trustee contends that various transactions were designed

to prevent Antonucci from collecting on his claim.

The main focus of this action involves Cathy's construction of two (2) homes, known to the

parties as "the Mt. Kirk House" and "the Sellersville House."

Reduced to its essence, the Trustee theory of liability is based on three (3) propositions:

1. Carbone Bros. constructed the two (2) houses on the properties owned by
   Cathy, in one case fraudulently transferring its right to payment to Builder Pros-
   1 and, in the other case, receiving no payment at all from Cathy.

2. Carbone Bros.' right to payment is included in the Debtor's bankruptcy estate
   because the Carbone Bros. "corporate veil" should be pierced and the company
   should be treated as the Debtor's alter ego.[1]

3. Alternatively, the bankruptcy estate is entitled to the payments received by
   Builder Pros-1 for construction of the Mt. Kirk House based on the doctrine
   known variously as "single-entity," "enterprise liability" or "horizontal liability"
   doctrine, "the thrust of [which] is that, just as a corporation's owner or owners

---

[1]      I will use the term "corporate veil" when referring to the defendant limited liability entities in this
adversary proceeding even though, strictly speaking, they are not corporations.

may be held liable for judgments against the corporation when equity requires, so may affiliated or 'sister' corporations — corporations with common ownership, engaged in a unitary commercial endeavor — be held liable for each other's debts or judgments.  <u>Mortimer v. McCool</u>, 255 A.3d 261, 266 (Pa. 2021).[2]

Based on these contentions,[3] and citing 11 U.S.C. § 548(a)(1) and 11 U.S.C. § 544(b) as statutory authority for the fraudulent transfer claims, the Trustee seeks a judgment of $556,000.00 from the Defendants, calculated as follows: $306,000.00 in funds for the construction of the Mt. Kirk House and $250,000.00 representing the value of the construction services provided for the Sellersville House.

For the reasons explained below, I find that the Trustee has not proven his claims. Therefore, judgment will be entered in favor of the Defendants on all claims.

---

[2]     Like the court in <u>McCool</u>, in this Opinion, I will use the employ the term "enterprise liability."

[3]     In the Amended Complaint, the Trustee alleged Carbone Bros. was a sham entity because (1) the separate existence of Carbone Bros. was frequently ignored; (2) the partners intermingled the assets of Carbone Bros. with their personal assets; (3) Carbone Bros. paid the personal expenses of the partners' wives; (4) partnership returns were not, and have not been, filed for Carbone Bros. despite Carbone Bros. doing business; (5) sales of homes that were constructed by Carbone Bros. were reported on the individual partners' returns rather than on the entity's tax returns; and (6) books and records were not kept, meetings were not held, and Sal excluded the other partners in the business affairs of Carbone Bros.

In his post-trial brief, the Trustee appears to have abandoned many of these arguments and primarily relies upon the events discussed in the text above as amplified below.

## II. <u>PROCEDURAL HISTORY</u>

The Debtor commenced the underlying bankruptcy case under chapter 7 of the Bankruptcy

Code on May 22, 2018 and received his discharge approximately five and half months later, on

November 8, 2018.[4]

The Trustee commenced this adversary proceeding on March 29, 2019, by filing a three (3)

count Complaint against the Defendants.  After I granted the Defendants' Motion to Dismiss the

Complaint, but with leave to amend, the Trustee timely filed an Amended Complaint on June 10,

2019.

The Amended Complaint asserted six (6) claims against the Defendants.

In Counts I and II, the Trustee asserted claims for avoidance and recovery under 11 U.S.C.

§548(a)(1)(A) and §550(A).

In Counts III and IV, the Trustee invoked 11 U.S.C. §544(b) and asserted claims for

avoidance and recovery under the Pennsylvania Uniform Void Transactions Act ("PUVTA") 12

Pa. C.S. §§5104(a)(1), (a)(2), pursuant to §544(b).

In Count V, the Trustee asserted a claim to pierce the corporate veil of one of the defendant

entities, Carbone Bros., under an alter ego theory.  Based on this theory, the Trustee requested the

court disregard the limited liability entities' separate existences and attribute any and all of the

Carbone Bros.' assets to the Debtor and Ray.

Finally, in Count VI, the Trustee sought turnover of certain property pursuant to 11 U.S.C

§542.

---

[4]      Ray filed a chapter 7 bankruptcy case on May 10, 2017 and received his discharge on October 17, 2017. (Bky. No. 17-13331).  Bruno Carbone, the third principal of Carbone Bros., filed a chapter 7 bankruptcy case on June 8, 2018 and received a discharge on September 20, 2018.  (Bky. No. 18-13852).

The Defendants filed a Motion to Dismiss the Amended Complaint on June 28, 2019.  On January 27, 2020, I dismissed Count II which asserted a claim under 11 U.S.C. §548(a)(1) with respect to the alleged transfer of the Mt. Kirk House.[5]  I also dismissed the portion of Count VI that sought turnover of property located in Montrose County, Pennsylvania.

Thereafter, on February 17, 2020, the Debtor filed an Answer to the Amended Complaint. The parties filed competing Motions for Summary Judgment on December 21, 2020, that I denied on January 4, 2021.

Although the parties were unable to agree to any uncontested facts, they filed a Joint Pre-Trial Statement on February 8, 2021.  Beginning May 20, 2021, I conducted a two (2) day trial by video conference.  I heard testimony from Cathy, Paulette Finney (an insurance agent), Bruce Lazar (a real estate appraiser), Ray, the Debtor, and Wendy and numerous exhibits were admitted into evidence.  Thereafter, the parties filed post-trial memoranda.[6]

## III. <u>FINDINGS OF FACT</u>

Based on the credibility and demeanor of the trial witnesses, the plausibility of their testimony, the existence of corroborating circumstantial, testimonial or documentary evidence, the totality of the evidentiary record presented at the trial and my consideration of the parties' post-trial submissions, I make the following findings of fact.

---

[5]    The Trustee had alleged in Count II that Cathy, in buying the Mt. Kirk property, acted as a straw purchaser for Carbone Bros. and after construction, Carbone Bros. transferred the house to Cathy for little or no value.

[6]    The parties did not order a trial transcript.  The trial was recorded using both Zoom video-conferencing system and AT&T audio recording services.  These recordings are stored in several different files.  Citations to the trial record will indicate the date of the testimony, the file number, and the approximate time stamp.

## A.    Carbone Bros. – Sal, Ray and Bruno

1.    Carbone Bros. was formed initially as a general partnership in 1994 and registered as a limited liability partnership on October 22, 1996.  (Defs' Ex.1).[7]

2.    The Debtor, Ray, and Bruno Carbone were equal partners in Carbone Bros., each owning a one-third interest.  (Defs' Ex.1, and 2; May 20, 2021 File 4 at 21:10, 1:35:10; May 21, 2021 File 2 at 1:00:30).

3.    The Debtor, Ray, and Bruno executed a partnership agreement, but the agreement has since been lost.  (May 20, 2021 File 4 at 20:20, 1:35:10).

4.    Carbone Bros. provided carpentry and framing services for real estate developers such as Toll Brothers, David Cutler, and Gambone. (May 20, 2021 File 1 at 25:30; May 20, 2021 File 4 at 1:43:15).

5.    Carbone Bros., acting as general contractor, while also providing labor on projects built from the ground up, constructed approximately twenty-five (25) houses for property owners or investors.  (Pl.'s Ex. 22 at 2; May 20, 2021 File 1 at 26:30).

6.    Carbone Bros. never owned a building lot.  The Debtor, Ray, Bruno, and sometimes other investors, would own the building lot in their individual names.  (May 20, 2021 File 1 at 26:30; 37:30).

7.    Carbone Bros.' profit margins on construction of new homes were 8%-10%.  (May 20, 2021 File 1 at 40:26).

---

[7]    Under Pennsylvania law, a limited liability partnership (LLP) is an existing general partnership that files a statement of registration with the Bureau of Corporations and Charitable Organizations, electing or claiming limited liability status under 15 Pa. C.S. §8201(a).

8.     The Debtor kept Carbone Bros.' books and Ray and the Debtor both worked on project invoicing.  (May 21, 2021 File 1 at 12:25).

9.     For most of the Carbone Bros. existence, its business address was the Debtor's home located at 368 Old Morris Road, Harleysville, PA.

10.   John Antonucci was an investor in Carbone Bros.' residential construction projects in Delaware.  (Pl.'s Ex. 22 at 16-17).  He filed suit against Carbone Bros., the Debtor, Ray, Bruno, and John Stolfi on July 21, 2009.

11.   On February 23, 2017, a state court arbitrator granted Antonucci an award of $456,860.52 against Carbone Bros., the Debtor, Ray, Bruno, and Stolfi.  (Amended Complaint at ¶18). The award was confirmed by court order dated October 2, 2017.  (Id. Ex. A).

12.   Carbone Bros. ceased operations in 2009 and its last filed tax return was for the year 2009.  (Defs' Ex.2; May 20, 2021 File 4 at 15:14, 31:51).

13.   Carbone Bros. primarily ceased operations because of the economic conditions in 2009. (May 20, 2021 File 4 at 1:35:40).

14.   Carbone Bros. did not perform any construction work or earn any revenue after 2009. (May 20, 2021 File 4 at 1:02:00, 1:36:01).

15.   After 2009, the Debtor, Ray, and Bruno never worked together again with the exception of a single project in Florida in 2018 when Ray employed the Debtor.  (Defs' Ex.30 at D929; May 20, 2021 File 4 at 1:36:01, 2:00:36).

16.   Carbone Bros. retained an active contractor's registration with the Commonwealth of Pennsylvania as late as 2017.  (Pl.'s Ex. 10 at 30).

## B.   Parkside American Grille - Sal and Wendy

17.   From 2009 until 2014, the Debtor and Wendy opened a restaurant called Parkside

American Grille.  (Defs' Ex.26a).

18.   The Debtor and Wendy were the 100% owners of the LLC that owned the restaurant

(Parkside American Grille, LLC).  (Defs' Ex.3 at D26).

19.   Ray and Bruno did not have any involvement with Parkside American Grille.

20.   As reflected on the Debtor's and Wendy's tax returns, from 2009 through a portion of

2013, Parkside American Grille was the sole source of the Debtor's income.  (Defs'

Ex.26a).

21.   The Debtor and Wendy's tax returns from 2010 through 2018 did not reflect any income

attributable to Carbone Bros.  (Defs' Ex.26b).

## C.  Carbone Construction – the Debtor

22.   In 2013, the Debtor operated a sole proprietorship known as Carbone Construction that

performed small construction jobs such as installing decks or paver patios.  (Defs' Ex.5 at

D32 – D33).

23.   The Debtor and Wendy reported income from Carbone Construction on their tax return.

(Defs' Ex.26b at D303 – D304).

24.   The Debtor invoiced customers using the name Carbone Construction.  (Defs' Ex.5).

**25.**   The Debtor deposited income from Carbone Construction into the Carbone Bros.'

Harleysville Bank account.  (May 21, 2021 File 1 at 21:00; 1:13:50; Defs' Ex.5 at D32,

D33 and Defs' Ex.29 at D880, D882).

### D.  Builder Pros-1 – the Debtor

26.    On June 17, 2014, the Debtor formed Builder Pros-1, a Pennsylvania limited liability

company (Defs' Ex.18).

27.    The Debtor paid for the incorporation of Builder Pros-1 by withdrawing $374.00 from the

Harleysville bank account.  (Defendants Ex. 29 at D886).

28.    When he started Builder Pros-1, the Debtor opened a bank account at First Niagara Bank

but was still receiving money from Carbone Construction projects which were deposited

in Carbone Bros.' Harleysville account.  (May 21, 2021 File 2 at 5:00).

29.    Builder Pros-1 was solely owned by the Debtor.  Neither Ray nor Bruno were ever

employees of Builder Pros-1 or were paid any money by Builder Pros-1. (Defendants Ex.

18; May 21, 2021 File 2 at 1:17:30).

30.    The Debtor and Wendy reported income from Builder Pros-1 on their 2014, 2015, 2016,

and 2017 tax returns.  (May 21, 2021 File 2 at 1:18:15; Defendants Ex. 26a at D318 –

D319; Defendants Ex. 26b at D342 – 343, D337 – D368; D391 – D392).

31.    Builder Pros-1 ceased operations prior to September 2017 at which time it did not have

any assets.  (May 21, 2021 File 2 at 37:30).

32.    The Debtor obtained a general liability insurance policy for Builder Pros-1 from Erie

Insurance for the coverage period September 30, 2014 through September 30, 2015.

(Pl.'s Ex. 15 at Carbone 86 – Carbone 89).  The policy covered the under-construction

Mt. Kirk House and contractors and subcontractors working on the site.  (Id.).

33.    On July 31, 2015, the Debtor directed Erie Insurance to remove the Mt. Kirk House from

the general liability insurance policy and to place the Sellersville House, which he valued

at $250,000.00, on the policy instead.  (Pl.'s Ex. 15 at Carbone 80 – Carbone 82; May 21, 2021 File 2 at 9:15).[8]

34.    The Debtor cancelled the Erie Insurance policy effective November 11, 2016.  (Pl.'s Ex. 15 at Carbone 84).

35.    The Debtor also obtained for Builder Pros-1 a commercial inland marine/builder's risk policy for the Mt. Kirk House covering the term September 30, 2014, through September 30, 2015.  (Pl.'s Ex. 16 at Carbone 135 – Carbone 143).

36.    The commercial inland marine/builder's risk policy remained in effect until it was canceled effective November 11, 2016.  (Pl.'s Ex. 16 at Carbone 191 – Carbone 192).

37.    The Debtor reported income of $55,000.00 from an unnamed "carpentry" business on his and Wendy's 2018 tax return.  (Defendants Ex. 26b at D463).

38.    Debtor received a 1099 reporting $55,000.00 in compensation from Ray for the 2018 tax year.  (Defendants Ex. 30).


### D.  Builder Pros-2- Wendy

39.     On March 29, 2017, Wendy formed Builder Pros-2.  (Defs' Ex.33; Plaintiff's Rebuttal Ex. 1).

40.    Wendy is the sole owner and operator of Builder Pros-2. (May 21, 2021 File 3 at 30:56).

41.    Wendy is responsible for the financial operations, bookkeeping, and site evaluations, and all the clients of Builder Pros-2 were solely obtained by Wendy.  (May 21, 2021 File 3 at 32:35).

---

1.    [8]    At the time, the Debtor believed it was possible Cathy was going to hire him to complete the Sellersville House.  (May 21, 2021 File 2 at 9:15).

42.    Builder Pros-2 performs landscaping services, snow plowing, and small construction

projects and, in the past, has acted as a project manager on a large house flipping project.

(May 21, 2021 File at 16:02, 31:08).

43.    For the most part, Builder Pros-2 does not provide manual labor on projects, but rather

uses subcontractors to complete projects.  Wendy occasionally performs landscaping

services herself.  (May 21, 2021 File 3 31:15).

44.    Prior to the formation of Builder Pros-2, the Debtor worked for a company, MG

Hardscaping, who provided landscaping and property maintenance services to the

Malvern School.  (May 21, 2021 File 2 at 50:38; File 3 at 21:13).

45.    After formation of Builder Pros-2, Wendy approached the Malvern School and placed a

bid to provide landscaping/property maintenance services.  (Id., 34:52).

46.    Wendy bids the Malvern School contract every year and through May 2021 continued to

provide landscaping/property maintenance services to the Malvern School.  (May 21,

2021 File 3 at 32:47, 36:50).

47.    The Debtor occasionally provided labor to Builder Pros-2, for which he received a form

1099. (May 21, 2021 File 3 at 31:45).

48.    Builder Pros-2 does not have any assets.  (May 21, 2021 File 3 at 32:35).


### E.  Carbone Bros.' Harleysville Bank Account

49.    The Carbone Bros. bank account with Harleysville Bank continued to exist after the

partnership ceased operations.  (Plaintiffs' Ex. 8).

50. The bank account was essentially dormant from 2010 through February 2013, when the Debtor began depositing money he earned from Carbone Construction into the account. (May 21, 2021 File 2 at 5:00, 1:13:50).

51. Ray deposited money he earned as a handyman/contractor into the Carbone Bros. Harleysville bank account after he returned from Florida in 2012.  (May 20, 2021 File 4 at 1:57:12).

52. From and after 2013, none of the money deposited in the Carbone Bros. Harleysville bank account was derived from revenue earned from Carbone Bros. projects and each brother who used the account knew which deposits and which withdrawals were his. (May 20, 2021 File 4 at 1:57:45).

53. The account balance of Carbone Bros.' Harleysville bank account in February 2013 was $153.35.  (Pl.'s Ex. 8 at Carbon 319).

54. From March 2013 through December 2014, deposits of $247,332.81 were made and withdrawals of $246,942.41 were made. (Id. at Carbon 320 – Carbone 377).

55. From January 2015 through March 2017, when the balance was reduced to $0.00 and the account was closed, there were minimal deposits and withdrawals.  (Id. Carbone 378 – Carbone 404).

## F.  Ray and the Erie Insurance Policies

56. After 2009, the Carbone Bros. partnership still owned a single 2006 Dodge Ram truck that was subject to a loan taken out in Carbone Bros.' name. (May 20, 2021 File 4 at 1:38:02).

57. After Carbone Bros. ceased operations, Ray worked as handyman/carpenter and lived in Florida from 2011 until sometime in 2012. (May 20, 2021 File 4 at 1:36:01).

58. The 2006 Dodge Ram was left in Pennsylvania when Ray moved to Florida.  (May 20, 2021 File 4 at 2:12:32).

59. When Ray returned to Pennsylvania in 2012, he worked as a handyman/carpenter and did a few snow plowing jobs.  (May 20, 2021 File 4 at 1:41:15).

60. Ray made the loan payments on the vehicle .  (May 20, 2021 File 4 at 2:12:32).

61. Ray also insured the 2006 Dodge through an Erie Insurance policy covering the term July 27, 2012 through July 27, 2013. He took the policy out under the Carbone Bros. name at the 368 Old Morris Road address.  (Defs' Ex.31 at D930 – D931, D935; May 20, 2021 File 4 at 1:38:02).

62. On July 25, 2012, Ray wrote a check in the amount of $1,073.00 to Erie Insurance drawing from the TD Bank account of "Raymond Carbone DBA Tastefully Yours, 3 Gina Circle Hatfield, PA 19440." (Defs' Ex.35 at D935).

63. Ray insured the 2006 Dodge Ram under Carbone Bros. name at his personal address, 3 Gina Circle, through an Erie Insurance policy covering the term July 27, 2013 – July 27, 2014.  (Defs' Ex.31 at D932).

64. This policy was amended effective November 7, 2013 when Ray removed the 2006 Dodge Ram from the policy and placed a 2008 Chevrolet on the policy.  (Defs' Ex.31 at D932).

65. Ray cancelled the Erie Insurance vehicle policy effective November 12, 2013.  (Defs' Ex.31 at D933 – D934).

66.    Ray, representing himself as president of Carbone Bros., also obtained Erie Insurance's
"Fivestar Contractors Policy," a commercial general liability insurance policy, covering
the term July 27, 2012 through July 27, 2013 in the name of Carbone Bros. located at 368
Old Morris Road. (Pl.'s Ex. 11 at Carbone 32 – Carbone 38).

67.    Ray represented that the insured would be performing carpentry and small remodeling.
(Pl.'s Ex. 11 at Carbone 36).

68.    On August 29, 2013, Ray used his Visa card to make a payment to Erie Insurance in the
amount of $195.00 listing Carbone Bros. as the payer and his address of 3 Gina Circle,
Hatfield.  (Plaintiff Ex. 11 at Carbone 0074).

69.    Ray renewed the policy for the term July 27, 2013 through July 23, 2014 and invoices
were addressed to Carbone Bros., 3 Gina Circle; Ray's address at the time.  (Pl.'s Ex. 11
at Carbone 51).

70.    Ray cancelled the liability policy effective July 31, 2014.  (Pl.'s Ex. 11 at Carbone 34).

## G.  Cathy Sikora, Ray, and the Sellersville House

71.    Cathy met Ray in 2009 and they have been dating since that time.

72.    Ray moved in with Cathy and her two sons in 2014.  (May 20, 2021 File 1 at 20:02).

73.    Cathy used money from her divorce property settlement to purchase two (2) lots located at
278 and 279 Elmhurst Ave., Sellersville, PA on March 10, 2014, for $45,500.00.  (Defs'
Ex.6; May 20, 2021 File 2 at 7:00).

74.    The lots were consolidated into a single lot at 260 Elmhurst Ave.

75.    In February 2014, Ray obtained all the construction related permits for the Sellersville
House from the Borough of Sellersville by representing that "Carbone Brothers" was the

principal contractor on the project with a mailing address of "3 Gina Circle, Hatfield,
PA" and that Cathy was the owner of the property. (Pl.'s Ex. 17a-17b; Defs' Ex.15, and
16).

76.    The construction permit and a later extension was granted to Cathy Sikora as the owner
and Carbone Bros. as the contractor. (Pl.'s Ex. 17c-17d).

77.    The following documents referred to the Sellersville House as the "Carbone Brothers
Property:"

> (a) the deed description for the lot consolidation of the Sellersville property (Pl.'s
> Ex. 17g);
>
> (b) the earth disturbance report drawings (Pl.'s Ex. 18a-18c);
>
> (c) the Bucks County Conservation District erosion and sediment pollution control
> plan (Pl.'s Ex. 18d-18e); and
>
> (d) grading permit plan (Pl.'s Ex. 17h).

78.   The permit drawings referred to the Sellersville House as the "Carbone Residence." (Pl.'s
Ex. 17j).

79.    The permit application review letter was carbon copied to "Mr. Ray Carbone, Carbone
Brothers." (Pl.'s Ex. 18).

80.    Ray signed and submitted a construction compliance statement representing himself as
the "Builder" of the Sellersville House, (Pl.'s Ex. 18), and in email correspondence, Ray
represented himself as the builder of the Sellersville House. (Pl.'s Ex. 18g).

81.    Construction on the Sellersville House began in December 2014. Footings were
constructed on or shortly before December 2, 2014, and the foundation was poured later
in December 2014. (Defs' Ex.16).

82. Final inspection of the Sellersville House was conducted on August 28, 2018. (Defs' Ex.16).

83. Cathy, with Ray's help, built the Sellersville House using foundation, roofing, and siding subcontractors, who were paid by Cathy. (May 20, 2021 File 1 at 1:37:05, 1:38:22; May 20, 2021 File 2 at 19:30).

84. On December 4, 2014, Cathy wrote a check to S&S Concrete in the amount of $5,000.00 for pouring of the foundation. (Defs' Ex.27a at D534, D538).

85. On December 4 and December 12, 2014, Cathy wrote checks in the amount of $821.50 and $1,143.33 to Force Leasing Corp and noted on the checks that these payments were for 260 Elmhurst and S&S Concrete. (Defs' Ex.27 at D541, D543).

86. Cathy produced receipts from Home Depot, Lowes, and Empire Today along with bank records reflecting payments to Lowes, Sears Roebuck, Home Depot, and American Express in connection with the construction of the Sellersville House. (Defs' Ex.17, 27a, and 27b).

87. The Debtor worked on the Sellersville House for a day or two but was not compensated for his work. (May 20, 2021 File 1 at 1:39:50; May 20, 2021 File 4 at 1:22:45).

## G.  The Mt. Kirk House

88. Cathy purchased a lot located at 45 West Mt. Kirk Ave., Eagleville, PA in 2014, for $120,000.00.

89. On May 27, 2014, Cathy signed a contract with Carbone Bros. to construct a house at the Mt. Kirk property for $306,000.00. (Pl.'s Ex. 26 at Citizens 190 – Citizens 194).

90.    Ray prepared the $306,000.00 bid and contract.  (Pl.'s Ex. 26; May 20, 2021 File 4 at

1:53:18).

91.    Ray signed the May 27, 2014, contract representing himself as a partner of Carbone Bros.

(Pl.'s Ex. 26 at Citizens 194; May 20, 2021 File 1 at 29:40, 35:40).

92.    Section XVI of the contract provided the "contract shall not be assigned without the

written consent of all parties."  (Pl.'s Ex. 26 at Citizens 194).

93.    Cathy did not intend to use Carbone Bros. as her contractor but signed the contract

because she needed a construction contract to submit to Citizens Bank as part of the

construction loan process. (May 20, 2021 File 1 at 35:40).

94.    Around July 25, 2014, the Debtor through Builder Pros-1, submitted a bid of $305,500.00

to build the Mt. Kirk House.  (Defs' Ex.19; May 21, 2021 File 2 at 1:20:40).

95.    On August 12, 2014, Cathy obtained a note and construction loan from RBS Citizens,

N.A. secured by the Mt. Kirk property.  (Defs' Ex.14).

96.    Cathy directed the construction loan proceeds should be released to Builder Pros-1 rather

than Carbone Bros.  (Defs' Ex.22).

97.    Between September 3, 2014, and May 28, 2015, Builder Pros-1 received the six (6) draws

totaling $305,500.00 on account of the construction of the Mt. Kirk property.  (Defs'

Ex.25 at D142-D171).

98.    Ray, representing himself as the manager of Builder Pros-1, and Cathy as owner of the

property signed a Citizens Bank form authorizing the release to Builder Pros-1 of the

second through sixth draws.  (Pl.'s Ex. 26 at Citizens 207).

99.    The Debtor itemized his expenses to build the Mt. Kirk House and concluded he had

expended $279,837.39 — leaving a $25,662.61 profit.  (Defs' Ex.23).

100. Ray obtained the construction permits and certificate of occupancy for the Mt. Kirk
     House from Lower Providence Township by representing that "Carbone Brothers LLP"
     was the contractor on the project and that Cathy was the owner of the property.  (Pl.'s Ex.
     14).

### G.  The Mt. Kirk House Valuations

101. Bruce Lazar is a certified real estate appraiser hired to appraise the value of the Mt. Kirk
     House prior to construction on June 17, 2014.  (May 20, 2021 File 4 at 1:16, 2:29; Pl.'s
     Ex. 26 at Citizens 163).

102. Using the sales approach, Lazar valued the house at $450,000.00 and using the cost
     approach he valued the cost of improvements at $406,324.00.  (Pl.'s Ex. 26 at Citizens
     165).

### IV.  APPLICABLE LAW

### A.  Piercing the Corporate Veil

The Trustee seeks to pierce the Carbone Bros. corporate veil and reach its entitlement to payment by employing the alter ego theory.

Under Pennsylvania law, there is a strong presumption in favor of respecting the veil of an artificial entity.  See Mortimer v. McCool, 255 A.3d 261, 268 (Pa. 2021); Lumax Indus., Inc. v. Aultman, 669 A.2d 893, 895 (Pa. 1995).  Courts will set aside the strong presumption in favor of shielding shareholders of corporations and members of limited liability companies from liability for the obligations of their entity only to "prevent fraud, illegality, or injustice, or when recognition of the . . . entity would defeat the public purpose or shield someone from a liability for a crime."

In re Jamuna Real Estate, LLC, 365 B.R. 540, 563 (Bankr. E.D. Pa. 2007) (quoting Zubik v.

Zubik, 384 F.2d 267, 272 (3d Cir. 1967)).  Additionally, "a very high showing of domination and

control" is necessary to establish "alter-ego" liability.  Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pa.,

Inc., 848 F. Supp. 569, 580 (E.D. Pa. 1994).

Generally speaking, alter ego liability on an individual may be imposed "whenever one in

control of a corporation uses that control, or uses the corporate assets, to further his or her own

personal interests."  Ashley v. Ashley, 393 A.2d 637, 641 (Pa. 1978) (citation omitted).

Alter ego liability requires proof establishing two (2) elements:

(1) the party exercised domination and control over the entity; and

(2) injustice will result if the corporate fiction is maintained despite a unity of
interests between the entity and its principal.

In re Kitchin, 445 B.R. 472, 481-82 (Bankr. E.D. Pa. 2010) (citing cases); see also In re Pocius,

556 B.R. 658, 671 (Bankr. E.D. Pa. 2016).


## B.  The Enterprise Liability Doctrine

The Trustee also targets Builders Pro-1 by invoking the enterprise liability doctrine.

In Mortimer, the Pennsylvania Supreme Court held that the enterprise liability doctrine is

viable under Pennsylvania law.  The court opined that this legal theory should be employed "only

in cases of great injustice," emphasizing that "inequity must remain the lodestar of piercing

jurisprudence."  Mortimer, 255 A.3d 261, 284 (Pa. 2021).

The court explained the mechanics of the enterprise liability doctrine as follows:

[E]nterprise liability in any tenable form must run up from the debtor
corporation to the common owner, and from there down to the targeted sister
corporation(s). As set forth above, in this frame, enterprise piercing is aptly
described as triangular. But this requires a mechanism by which liability
passes through the common owner to the sibling corporation. This brings us

> to "reverse-piercing," which this Court has not had prior occasion to consider.
>
> In a reverse-piercing scenario, a claimant against the owner of a corporation must establish misuse of the corporate form to protect the owner's personal assets against some debt. As with enterprise liability, while this Court has never explicitly adopted reverse-piercing, we have never rejected it either. To rule out reverse-piercing as a viable doctrine would be tantamount to saying either that it is not possible for a corporation's owner to use that corporation as a shield against personal liability by the creative movement of assets or liabilities between himself and the corporation, or that equity cannot reach such an event even when it happens. Pennsylvania courts' equitable powers should not be so constricted.

Id. at 285 (footnotes and citations omitted).

The court explained the enterprise and reverse-piercing theories required "there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and second, adherence to the corporate fiction under the circumstances would sanction fraud or promote injustice. . . ." Id. at 286-87.

Other than this direction, the court did not endorse a specific list of factors to be considered when appraising an enterprise theory claim, but rather encouraged the lower courts to consider existing piercing case law and to develop a body of law regarding when piercing under the enterprise and reverse-piercing theories is justified and not justified. Id. In this regard, I observe that the Mortimer court referenced several factors that potentially might be considered by a court faced with an enterprise theory claim. Those factors are:

1. identity of ownership;

2. unified administrative control;

3. similar or supplementary business functions;

4. involuntary creditors; and

5. insolvency of the corporation against which the claim lies.

20

*Mortimer*, 255 at 271 (citing <u>Miners, Inc. v. Alpine Equip. Corp.</u>, 722 A.2d 691, 695 (Pa. Super. Ct. 1998)).

## C.  <u>Fraudulent Transfers – Actual Fraud</u>

The Trustee seeks to avoid and recover transfers related to the construction of the Mt. Kirk House and Sellersville House.  The purpose of fraudulent conveyance law is "to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away."  <u>Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. Pshp IV</u>, 229 F.3d 245, 250 (3d Cir. 2000).

The Trustee asserts that the transfers were made with an actual fraudulent intent and that he may recover under both 11 U.S.C. §544 and §548.

Section 544(b)(1), generally speaking, grants to the Trustee whatever avoidance powers are available to unsecured creditors under non-bankruptcy law. <u>See, e.g.</u>, <u>In Re Equipment Acquisition Resources, Inc.</u>, 742 F.3d 743, 746 (7th Cir. 2014).  In this case, applicable nonbankruptcy law is PUVTA.

The actual fraud subsection of PUVTA, 12 Pa. C.S. §5104, provides:

> (a) General rule.— A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1) with actual intent to hinder, delay or defraud any creditor of the debtor….

Because it is rare for a transferor to readily admit the transfer was motivated by an "actual intent" to defraud creditors, under PUVTA, when evaluating whether a transfer was motivated by actual fraud, a court may consider a set of "badges" or indicia of fraud.  <u>See, e.g.</u>,

In re Polichuk, 506 B.R. 405, 417 (Bankr. E.D. Pa. 2014); accord, In re Valley Bldg. & Const.

Corp., 435 B.R. 276, 285-286 (Bankr. E.D. Pa. 2010).

The Trustee bears the burden of proving the elements of the claim for relief by a

preponderance of the evidence. See 12 Pa. C.S. §5104(c); In re Carbone, 615 B.R. 76, 85 (Bankr.

E.D. Pa. 2020).

Under §548(a)(1)(A) of the Bankruptcy Code, the trustee may avoid any transfer made by a

debtor within two (2) years of the date of the filing of the petition where the debtor made such

transfer with actual intent to hinder, delay, or defraud any entity to which the debtor became

indebted after the date of the transfer.[9]  The same factors or badges of fraud employed under

PUVTA are applicable in determining "actual intent" for purposes of §548. See In re Valley Bldg.

& Constr. Corp., 435 B.R. 276, 285 (Bankr. E.D. Pa. 2010).  The Trustee bears the burden of

proof.  E.g., In re Fruehauf Trailer Corp., 444 F.3d 203, 211 (3d Cir. 2006).

Section 550 of the Bankruptcy Code permits the Trustee to recover for the estate the value

of any avoided transfers.

11 U.S.C. §550(a) provides, in relevant part, that

> to the extent that a transfer is avoided . . . the trustee may recover, for the benefit of
> the estate, the property transferred, or, if the court so orders, the value of such
> property, from-
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer
> was made; or
>
> (2) any immediate or mediate transferee of such initial transferee.

---

[9]    The definition of "transfer "under the Bankruptcy Code most relevant to this case is "each mode,
direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i)
property; or (ii) an interest in property." 11 U.S.C.S. § 101(54)(D)(i), (ii).

Subsection 550(a)(1) pertains to the <u>initial transfer</u> and provides for two (2) categories of parties that may be liable: (1) the "initial transferee" or (2) a party that was not the initial transferee, but "for whose benefit such transfer was made," (a "beneficiary transferee"). Subsection 550(a)(2) pertains to <u>subsequent transfers</u> and permits the trustee to recover an avoided transfer (or its value) from subsequent transferees of the initial transferee.  However, liability under §550(a)(2) is subject to a good faith defense set forth in section §550(b).

## C.  <u>Fraudulent Transfers – Constructive Fraud</u>

Alternatively, the Trustee seeks to prove constructive fraud under §5104(a)(2) of PUVTA, 12 Pa. C.S.§5104(a)(2), which provides the Trustee may avoid a transfer if the Debtor made the transfer:

> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (i) was engaged or about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (ii) intended to incur or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

The Third Circuit has set forth a two-pronged analysis for determining if a transferee furnished reasonably equivalent value:  first, the transferee must have given some "value;" and second, if value was given, it must be reasonably equivalent to what the debtor gave up.  See <u>In re R.M.L., Inc.</u>, 92 F.3d 139, 149 (3d Cir. 1996).  The Third Circuit has held courts should define the scope and meaning of "reasonably equivalent value" by conducting a totality of the circumstances analysis.  The Circuit explained this analysis consists of three factors: (1) whether the transaction

was at arm's length, (2) whether the transferee acted in good faith, and (3) the degree of difference

between the fair market value of the assets transferred and the price paid.  Id. at 153.

As the party asserting the claim for constructive fraud, the Trustee bears the burden of

establishing the requisite elements. E.g., Fruehauf Trailer Corp., 444 F.3d at 211; Valley Bldg.,

435 B.R. at 287.

# V.  THE PARTIES' CONTENTIONS

## A.  Piercing the Corporate Veil – Alter Ego and Enterprise Theories

The Trustee alleges Carbone Bros. is a sham entity that is the alter ego of the Debtor.  The

Trustee seeks to show Builder Pros-1 and Builder Pros-2 are the alter egos of Carbone Bros.

because the Debtor allegedly exercised domination and control of all three entities, which the

Trustee contends were created to avoid Carbone Bros.' creditors.  The Trustee points to (what he

describes, sometimes inaccurately) various facts and requests the court draw certain inferences to

support the requested finding or conclusion that Carbone Bros., Builder Pros-1, and Builder Pros-2

lacked separate existences:

1. The Debtor's withdrawal of $374.00 from the Harleysville Bank account to pay for the incorporation of Builder Pros-1.

2. The Debtor being the sole member of Builder Pros-1 which he contends was formed to receive the construction funds for the Mt. Kirk House.

3. Despite testifying that he was not doing business under Builder Pros-1 in 2018, although the Debtor reported income from Builder Pros-1 that year.

4. The Debtor using the Carbone Bros. name to obtain the permits from Lower Providence Township and Sellersville.

5. The Debtor drafting the proposed construction proposal for the Mt. Kirk House after the fact to obscure Carbone Bros.' connection to the project.

6. Carbone Bros.' insurance being covered construction of Mt. Kirk until the Debtor put in place Builder Pros-1's insurance.

7. The Debtor signing Erie Insurance documents as "d/b/a" Builder Pros-1.

8. The Debtor using different iterations of Builder Pros and Builder Pros-2 to confuse creditors.

9. The Debtor not producing any documentary evidence that Builder Pros-1 did any work at Mt. Kirk.

10. Carbone Bros. having active insurance in 2014 when construction began on the Mt. Kirk House and trucks were insured by Erie under Carbone Bros. name.

11. The Malvern School being the Debtor's client prior to formation of Builder Pros-2.

The Trustee also cursorily asserts the court should pierce the corporate veil under the enterprise theory. According to the Trustee, the Debtor established Builder Pros-1 and Builder Pros-2 solely to avoid Carbone Bros.' creditors and the two entities are substantially identical and should be considered the alter ego of Carbone Bros. because, according to the Trustee, the entities:

1. have the same management;

2. share a similar and/or supplementary business purpose;

3. share the same office, employees, and/or other equipment;

4. act as a similar operation; and

5. have the same customer accounts.

The Debtor counters that the Trustee has failed to establish the Debtor had domination and control over Carbone Bros. The Debtor, Ray, and Bruno were equal partners in Carbone Bros. They shared revenues and operating duties equally. By comparison, the Debtor emphasizes that he was the sole owner of Builder Pros-1 and that Ray and Bruno were never employed by Builder Pros-1. The Debtor also notes Carbone Bros. had only a truck as its sole asset (other than a bank

account with minimal or no money) when it ceased operations in 2009 and therefore, no commingling of assets occurred between Carbone Bros. and Builder Pros-1.[10]

Additionally, money deposited and withdrawn from the Harleysville Bank account was not the proceeds from Carbone Bros.' projects, but rather money earned by the Debtor from his sole proprietorship, Carbone Construction.[11]

The Debtor further argues that Builder Pros-2 is not the alter ego of Builder Pros because:

   (1) Wendy was not involved in Builder Pros-1 or Carbone Bros;

   (2) she is the sole owner of Builder Pros-2 who manages all the financials and bookkeeping and pays Sal for occasional work that is reported on a 1099 Form; and

   (3) she obtained all of Builder Pros-2's clients through her own contacts and efforts.

### B.  Fraudulent Transfer – Actual Fraud

The Trustee asserts that Carbone Bros. (which the Trustee argues is Sal's alter ego) constructed the Mt. Kirk House and then fraudulently transferred to Builder Pros-1 its right to payment for its services.  The Trustee perceives the Sellersville House as having been constructed by Carbone Bros. without receiving any payment.  The Trustee contends these transfers were purposefully designed to place value beyond Antonucci's reach, resulting in actual fraud under bankruptcy and Pennsylvania law.

The Trustee asserts the following badges of fraud are present:

   1.  the transfer of the payment rights from Carbone Brothers to Builder Pros-1

---

[10]   The Debtor also argues that all the grounds for piercing the corporate veil have been rebutted by evidence showing (1) Carbone Bros. had a written partnership agreement, (2) books and records existed and were properly kept, entirely separate from the affairs of its owners, (3) meetings took place regularly, (4) all corporate formalities were observed at all times, and (5) the separate existence of Carbone Bros. was always observed.

[11]   Of course, while this fact suggests that Carbone Bros. did not continue operating after 2009, it is a fact that does support piercing the corporate veil.

was to an insider, Sal Carbone;

2. the transfer was concealed;

3. the Debtor, along with Ray, Bruno and Carbone Brothers, had been sued and the case ordered into the trial pool when Sal established Builder Pros-1 to receive the construction loan proceeds;

4. the transfer was of substantially all the debtor's assets (i.e., the $306,000.00 right to payment);

5. the Debtor removed or concealed assets;

6. the value of the consideration received by the debtor was not reasonably equivalent to the value of the construction services rendered; and

7. the transfer occurred shortly after a substantial debt was incurred (the transfer occurred during the Montgomery County litigation and prior to a substantial judgment being entered (with Sal then establishing Builder Pros-2 when judgment was awarded on February 17, 2017).

The Debtor counters that the Trustee's actual fraud claim fails because the Trustee has not shown that Carbone Bros. performed the labor at either the Mt. Kirk House or the Sellersville House.

With respect to the Sellersville House, the Debtor testified that he was not paid for any labor provided at, he did not pull any permits, he did not insure the project and Carbone Bros. did not construct the house (observing that its Harleysville bank account was dormant during the construction of the Sellersville House).

Regarding the Mt. Kirk House, the Debtor asserts that the evidence demonstrates the house was built by Builder Pros-1 and paid for by Cathy and that neither Ray nor Bruno had anything to do with Builder Pros-1.

## C. Fraudulent Transfer – Constructive Fraud

The Trustee asserts he has proven constructive fraud because the Debtor received

$306,000.00 to build the Mt. Kirk House even though, based on the Lazar appraisal, the value of

the improvements was $406,325.00.  The Trustee maintains that the entire $306,000.00 was

fraudulently diverted away from Carbone Bros. and paid to Builders Pro-1.

The Debtor contends the court need not even reach the Mt. Kirk House constructive fraud

claim because the Trustee has not proven Carbone Bros. continued to operate after 2009 or that

Builder Pros-1 is the alter ego of Carbone Bros.  The Debtor argues the valuation of Mt. Kirk is

irrelevant because the only alleged value transferred was the labor itself and the Trustee failed to

present any evidence of the value of the labor provided by Builder Pros-1 or exclude any labor

provided by subcontractors.

As to the Sellersville House, the Trustee argues because neither Carbone Bros., Builder

Pros-1, nor the Debtor received any money for constructing the house, Cathy fraudulently received

a $250,000.00 in construction services.

The Debtor argues that this constructive fraud claim also fails because the Trustee has not

produced any evidence that the Debtor constructed Sellersville (as opposed to Cathy and Ray) or

any evidence regarding the value of the labor performed at Sellersville.[12]

---

[12]    The Debtor also argues some or all of the Trustee's claims are barred by the Bankruptcy Code's
two-year (2) statute of limitations and the majority of claims are barred by PUVTA's four-year (4) statute of
limitations.  The Debtor asserts the statute of limitations argument is irrelevant to Sellersville because no
transfer occurred with respect to that property.  The Debtor also contends five (5) of the six (6) payments
made to Builder Pros-1 for construction of the Mt. Kirk house were made more than four (4) years prior to
filing of the original complaint on March 29, 2019.  Thus, only the May 28, 2015 payment of $13,270.00
was within the limitations period.  I do not reach these arguments.

# VI. DISCUSSION

## A. <u>Piercing the Corporate Veil</u>

### 1.

To succeed, the Trustee's case requires that I find that after 2009:

    (1) Carbone Bros. continued operating;

    (2) the Debtor's business activities after 2009 were not distinct businesses but rather a continuation of the Carbone Bros. business; and

    (3) the Debtor so dominated Carbone Bros. to serve his own interests in a fraudulent or unjust manner so that it served as his alter ego and its corporate veil should be pierced.

As explained below, as factfinder, I conclude that the Trustee did not prove his case by a preponderance of the evidence.

Initially, I perceive two (2) general problems with the Trustee's theory.

First, to some extent, the Trustee's argument is self-contradictory. The Trustee views the Debtor's and Ray's occasional use of the "Carbone Bros." name in their activities as evidence that Debtor and Ray were still operating the business in a stealth manner. Yet, insofar as the Trustee looks to Ray's activities to support his contention that Carbone Bros. continued to operate, this evidence undercuts his theory that the entity was the Debtor's alter ego. And, even if Carbone Bros. continued to operate after 2009, if it is not treated as the Debtor's alter ego, any money or other property to which it might be entitled is not property of the Debtor's bankruptcy estate and the Trustee has no claim to it.

Second, it is difficult to see how the Debtor's use of Carbone Bros. would work an injustice — at least as to his main creditor, Antonucci. Antonucci's claims ran against both the Debtor and Carbone Bros. The Debtor's use of the Carbone Bros. entity would not serve to protect his assets from Antonucci.

**2.**

Separate and apart from these initial problems, the evidence that the Trustee has cobbled in support of his request to pierce the Carbone Bros. corporate veil is unconvincing.

From 1994 – 2009, the three (3) Carbone Bros. partners, Sal, Ray, and Bruno, worked together providing framing services and custom house construction.  The testimony and documentary evidence show that corporate formalities were observed prior to 2009.  The Debtor testified a partnership agreement existed at one time, he and Ray worked on the books and invoicing together, the partnership had a separate bank account from the partners, and the partnership filed tax returns separate from the partners' individual returns.

Further, the evidence demonstrates that Carbone Bros. ceased operating in 2009.

In 2009, the Debtor left the construction business and operated a restaurant with his wife for nearly five (5) years, initially owning and operating the Parkside Grill, a completely unrelated business.  As for Ray, in or after 2009, he left Pennsylvania to work and reside in Florida for nearly two (2) years.

Only after the Debtor and Wend closed the Parkside Grill, and more than four (4) years after Carbone Bros. ceased operations, did the Debtor and Ray each began operating separate, individual businesses providing carpentry, handyman, and small construction project services.  Just as the Debtor had reported his income derived from Carbone Bros. on his personal income tax returns, the Debtor duly reported his income from the restaurant and later from the sole proprietorship, Carbone Construction, and his next business entity (Builder Pros-1) on his tax returns.  The Debtor made no effort to hide the income he generated while the lawsuit was pending.

30

Thus, there is no evidence of record the that the three (3) Carbone Bros. partners worked together as equal partners after 2009.

The Trustee repeatedly points to the alleged commingling of funds in the Carbone Bros.' Harleysville bank account and the Debtor's withdrawal of $374.00 from that account to incorporate Builder Pros-1 as evidence Builder Pros-1 was the alter ego of Carbone Bros.

However, the record shows that after 2009, the Carbone Bros.' Harleysville bank account lay dormant until 2012 when the Debtor and Ray began making deposits and withdrawals.  Even though the funds deposited and withdrawn were not related to Carbone Bros.' business activities, but rather the Debtor's and Ray's individual business ventures and personal expenditures, the brothers used the Carbone Bros. bank account.  As the account contained a mere $153.35 in February 2013, the Debtor arguably withdrew money he deposited in the account after Carbone Bros. ceased operations and not the Carbone Bros.' money from the Harleysville bank account.  While this conduct is questionable, it hardly rises to the level of demonstrating that Carbone Bros. continued to operate.

Further, there also was some testimony the Harleysville bank account was kept open and Carbone Bros.' state contractor's registration active solely for purposes of the state court litigation and that after entry of the award in 2017 the bank account was closed and the contractor registration was allowed to lapse.  These decisions seem valid considering the ongoing litigation.

In the end, the use of the Harleysville bank account does not persuade me that Carbone Bros. still existed and was earning income.  Rather, it suggests only that Debtor and Ray were taking shortcuts and putting convenience before smart decision making, (a pattern which would be repeated by Ray, which I will get to shortly).

The Trustee also argues Carbone Bros., Builder Pros-1, and Builder Pros-2 lacked separate existences because the Debtor was the sole member of Builder Pros-1 which was formed to receive the funds for construction of the Mt. Kirk House.  By comparison, the Debtor, Ray, and Bruno were equal partners in Carbone Bros. with each brother providing labor and the Debtor and Ray sharing administrative duties.  These facts do not show that the Debtor exercising domination or control over Carbone Bros. to the exclusion of his brothers.

The Trustee further alleges the Debtor testified he was not doing business under Builder Pros-1 in 2018 yet he reported income from Builder Pros-1 that year.  The Trustee is mistaken. The Debtor reported $55,000.00 in income on a form-1099 from a project he and Ray worked on together in Florida during 2018.  See Finding of Fact Nos. 37 and 38; Defendants Ex. 26b at D463; Defendants Ex 30.

The Trustee also is mistaken in arguing the Debtor used the Carbone Bros. name to obtain the permits from Lower Providence Township and Sellersville Borough.  It was Ray, not the Debtor, who used the Carbone Bros. name to obtain the permits.  The Debtor is not responsible for Ray's misrepresentations.

The Trustee also argues that Carbone Bros. had active construction liability insurance and vehicle insurance when construction began on the Mt. Kirk House and that insurance remained active until the Debtor put in place Builder Pros-1's insurance.  The Debtor did not obtain or pay for either construction liability or vehicle insurance under the name Carbone Bros. in 2014.  The record reflects that Ray obtained and paid for the "Fivestar Contractors Policy" from July 2012 through July 31, 2014. In 2012, Ray also obtained and paid for vehicle insurance on Carbone Bros.' last asset, a 2006 Dodge Ram, that was ultimately cancelled on November 11, 2013.

The Debtor obtained a general liability and commercial inland marine/builders risk policies for Builder Pros-1that were effective from September 30, 2014, through November 15, 2016. Cathy did not receive her construction loan for the Mt. Kirk House until August 12, 2014, and Builder Pros-1 did not receive its first deposit until September 3, 2014.  Thus, contrary to the Trustee's assertions, insurance for the construction of the Mt. Kirk House was provided by Builder Pros-1, not Carbone Bros., and Carbone Bros. did not have any active insurance at the time construction could have commenced as the policies obtained by Ray had been cancelled.

In requesting that I infer that Carbone Bros. constructed Mt. Kirk, the Trustee  points to the Debtor having signed Erie Insurance documents as "d/b/a" Builder Pros-1, failing produce documentary evidence that Builder Pros-1 worked at Mt. Kirk, and allegedly drafting Builder Pros-1's Mt. Kirk construction bid after the fact.  However, I accept as credible the testimony of the Debtor, Ray, and Cathy that Builder Pros-1 was the contractor that built the Mt. Kirk House.

**3.**

The Trustee also asserts that Builder Pros-1 and Builder Pros-2 did not have separate existences because the Debtor allegedly used different iterations of the "Builder Pros" name to confuse creditors and because the Malvern School was the Debtor's client prior to the formation of Builder Pros-2.  More specifically, the Trustee finds the timing of the incorporation of Builder Pros-2 suspicious, coming thirty-four (34) days after the arbitration award in favor of Antonucci was entered.  The Trustee further alleges that it was actually the Debtor, and not Wendy, who

incorporated and ran Builder Pros-2 based on the Debtor's 341 hearing testimony where he stated

that he was "hands on" with Builder Pros-2's business.[13]

        The Trustee's position about Builders Pro-2 largely seems to be a legal non-sequitur.

Builder Pros-2 generates income by providing property maintenance services to the Malvern

School.  The entity had nothing to do with the construction of the Sellersville House or the Mt.

Kirk House and the Trustee has not identified any Builder Pros-2 property that he asserts is

property of the Debtor's bankruptcy estate.  Thus, the Trustee's purpose in challenging the bona

fides of Builder Pros-2 is unclear; one might wonder why Builder Pros-2 is a defendant in this

adversary proceeding.[14]

---

[13]    The Trustee also points to the fact that a 2013 GMC Sierra was depreciated on the 2017 and 2018 tax returns and insured under the Debtor's name.

    As a 2013 model year, the GMC Sierra was acquired long after Carbone Bros. ceased operating and was most likely purchased with marital funds.

    The GMC Sierra is listed on Schedule C "Construction" of the joint 2017 tax return filed by the Debtor and Wendy.  Both Builder Pros-1 and Builder Pro 2 operated during this tax year and the return does not attribute the vehicle to either business.  (Plaintiff Ex. 32 at p. 47-48).  The vehicle is listed again on the 2018 tax return Schedule C and attributed to both the Debtor and Wendy.

    The Trustee alleges the GMC Sierra was insured under the Carbone Bros. name.  Contrary to this assertion, the vehicle policy is in the name of "Salvatore Carbone" insured for the purpose of "Carpentry Contractor."  While the Debtor has testified he was not operating such a business in 2019, the vehicle was insured under a policy that came into effect when the Debtor was operating Builder Pros-1 and the 2019 amendment merely deleted a vehicle.  (Plaintiff Ex. 23, at Carbone 254 – 256).

    To the extent the 2013 GMC Sierra may have been owned by Builder Pros-1 or Builder Pros-2 and used by the Debtor, both companies are/were small businesses owned and managed individually by a married couple.  The failure to strictly adhere to all corporate formalities is not unusual in such a situation. The treatment of this vehicle on the Debtor's tax returns lacks materiality on the issue of piercing the corporate veil.

[14]    Putting it in its best light, I suppose that the Trustee refers to Builder Pros-2 as a bogus entity because he considers it part of the Debtor's ongoing practice of abusing the limited liability entity form.

In any event, I credit the Debtor's testimony he was employed as a subcontractor by MG Hardscaping that provided property maintenance services to the Malvern School. I also credit Wendy's testimony she obtained the Malvern School contract after formation of Builder Pros-2 because she had discovered that MG Hardscaping no longer wished to provide services to the Malvern School.[15]

### 4.

The Trustee also seeks to pierce the Builder Pros-1 corporate veil (presumably, to capture its payment for the construction of payments made for the construction of the Mt. Kirk House) based on the enterprise theory. As stated earlier, this theory requires findings that (1) the Debtor exercised domination and control over both Carbone Bros. and Builder Pros-1; and (2) injustice will result if the Debtor is allowed to maintain the corporation fiction despite unity of interest between the two (2) corporations and the Debtor.

Again, the Trustee has not proven his case.

The Trustee has cherry picked facts and ignored other pertinent facts -- especially the more than four (4) years that elapsed between Carbone Bros. cessation of business and the Debtor's return to the construction business in his operation of Carbone Construction from 2012-2014.

---

[15]    Notwithstanding the Debtor's 341 meeting testimony, I credit Wendy's testimony she incorporated Builder Pros-2 and she manages the company while paying the Debtor for any services rendered. Wendy testified she studied landscaping in college, built a house with the Debtor, built a restaurant from the ground up, managed the restaurant, and worked as a nanny, and in recruiting. Wendy testified she used her own contacts from her personal life and previous professional connections to build Builder Pros-2's business. I find it perfectly reasonable Wendy was able to use her landscaping background and previous business and networking experience to build a company that provides landscape management and small construction services.

The Debtor was an equal partner with Ray and Bruno in Carbone Bros, which ceased operations in 2009.  The Debtor was the sole owner of Builder Pros-1 and neither Ray nor Bruno were partners in Builder Pros-1 or employed by the company.  The Debtor's part ownership of one entity (Carbone Bros.) and full ownership of a second entity (Builder Pros-2), ***created five (5) years after the first entity ceased operation***, is not sufficient to show the domination necessary to collapse the entities into the bankruptcy estate. Thus, there is no commonality of ownership between the two (2) artificial entities.

The Trustee also attributed certain acts committed by Ray to the Debtor.  After 2009, the Debtor did not use the "Carbone Bros." name, did not use Carbone Bros.' money or assets (except possibly to the extent that he deposited and withdrew money from the Carbone Bros.' account, money that was generated by non-Carbone Bros. business activities), and did not work with Ray and Bruno as business partners. The Trustee has failed to demonstrate the Debtor's subsequent construction related businesses were continuations of Carbone Bros.  Accordingly, I conclude Carbone Bros. and Builder Pros-1 are not alter egos and I decline to pierce the corporate veil.

### B.  Actual Fraud – the Mt. Kirk House

The Trustee asserts that the $306,000.00[16] – the proceeds of Cathy's construction loan – were actually a Carbone Bros.' asset based on the construction contract and that these funds were misappropriated by Builder Pros-1 in a purposeful attempt to defraud creditors.  The Trustee contends that "Sal, with assistance from Sikora and Ray  .  .  .  caused the payments to be diverted

---

[16]    The Trustee repeatedly refers to $306,600.00.  Builder Pros-1 received $305,500.00 from Cathy's construction loan.  The difference is immaterial.

to Builder Pros 1, then $306,000 would have been an asset of Carbone Brothers and be subject to attack by [creditors]."  (Pls. Mem. at 31).

The Trustee's case is dependent upon findings that Carbone Bros. continued to operate after 2009 and that its corporate veil should be pierced, collapsing its assets into the Debtor's bankruptcy estate.  I have already rejected these claims.

Further, as previously discussed, while Ray continued to use the name Carbone Bros. and to represent himself as a partner of Carbone Bros. to obtain vehicle insurance, business liability insurance, various permits, and Cathy's construction loan.  ***significantly, there is no evidence that the Debtor*** participated in these activities or was aware of or complicit in Ray's use of the Carbone Bros.' name in that regard.  To the extent the facts suggest the potential that a fraud occurred, the facts point in Ray's direction, not Sal's and the party allegedly misled was Citizens Bank, not the Debtor's creditors.  There was no purposeful diversion of income that could have been used to pay the creditors of either Carbone Bros. because the construction services for the Mt. Kirk House were provided by Builders Pro-1, an entity formed approximately five (5) years after Carbone Bros. ceased operations.

## C.  Constructive Fraud – the Mt. Kirk House

The Trustee asserts that Cathy received a substantial benefit when the Debtor built the Mt. Kirk House, but did not pay a reasonably equivalent value for the construction services rendered. The Trustee contends this is a fraud because Builder Pros-1 received $306,000.00, based on the Lazar appraisal, the Trustee values the cost of improvements at $406,324.00.

This claim again fails because it requires findings that Carbone Bros. continued operations after 2009 and that its corporate veil should be pierced.  Further, even if the Trustee had overcome these initial flaws, the record does not support a finding of constructive fraud.

A finding of constructive fraud requires factual determinations whether (1) any value was received, and (2) the value received was reasonably equivalent to the transfer made.

The Debtor credibly testified he submitted a competitive bid of $305,500.00 to Cathy. Builder Pros-1 received $305,500.00 from Cathy's construction loan.  The Debtor submitted evidence showing Builders Pro-1 profited by $25,662.61, approximately 9% — a figure in line with the Debtor's testimony regarding prior custom house construction profits.

Based on this evidence, I conclude that Builders Pro-1 received equivalent value for the services it provided.  Thus, even if Builders Pro-1 and Carbone Bros' were collapsed into the bankruptcy estate, the estate received reasonably equivalent value for the services it provided.

In reaching this conclusion, I am unpersuaded, as the fact finder, that the Lazar appraisal, which the Trustee uses to argue that the value of the improvements to the Mt. Kirk House was $406,000.00 (not $306,000.00) requires the opposite conclusion.

The Lazar appraisal represents the appraiser's opinion regarding the value of the Mt. Kirk House after construction was completed.  The fact this value may have exceeded the amount paid in construction costs does not mean that the construction costs were artificially low.  It is natural to expect that the fair market value of an improved property will exceed the construction costs once the house is a finished product.  The Trustee asks me to make an inferential factual leap that I am unwilling to make.  Thus, without additional evidence, the Lazar appraisal, by itself, is not convincing.  The Trustee has not satisfied his burden of proof on the valuation issue, another shortfall in his legal theory on this claim.

### D.  **Actual Fraud – Sellersville House**

The Trustee asserts Carbone Bros. should have been paid for the construction of the Sellersville House because Ray used the Carbone Bros. name to obtain permits.  The Trustee urges me to reject Cathy's and Ray's testimony they built the house without a contractor as not credible. As factfinder, I decline to do so.

The Trustee failed to produce any evidence that Carbone Bros. provided the labor to build the Sellersville House.  Ray, an experienced contractor, and Cathy credibly testified they constructed the house to a state of near completion over four (4) years.  Consistent with her testimony, the record reflects that subcontractors were used to build the house.  For example, Cathy paid S&S Concrete $5,000.00 to pour the foundation.  She also produced numerous receipts and credit card bills reflecting purchases from home improvement stores.

Carbone Bros.' only connection to the Sellersville House is because of Ray's actions.  It was Ray who used the name to obtain construction permits.  Beyond this misuse of the Carbone Bros. name there is no evidence Cathy paid Ray for his labor on the project. In fact, the Debtor credibly testified that he poured a sidewalk at the property and was never compensated for his labor.  The Trustee improperly imputes the potentially improper actions of Ray to the Debtor to manufacture a connection between a defunct company and the Debtor.

### E.  **Constructive Fraud – the Sellersville House**

The Trustee's constructive fraud theory is based on the  substantial benefit Cathy received when she built the Sellersville House, without paying Carbone Bros., the Debtor, or Builder Pros-1 any money.  The Trustee's argument fails because, as previously explained, the record shows that

Cathy and Ray built the Sellersville House with their own labor and the use of subcontractors. The record does not demonstrate the Debtor, or any of the construction entities he owned, constructed the Sellersville House.[17]

### VII.    THE DEFENDANTS' REQUEST FOR ATTORNEYS' FEES

The Defendants have requested the award of attorney's fees because they claim the Trustee pursued the case on behalf of single creditor (Antonucci), using that creditor's attorney and that this litigation's purpose was to extract revenge, resulting in the imposition of litigation costs disproportionate to the issue and value of the case.

The Defendants have not stated the source of authority, statutory or otherwise, for their fee-shifting request. In these circumstances, I infer that they are invoking the court's "inherent power" to sanction litigants and their counsel. See Chambers v. NASCO, Inc., 501 U.S. 32 (1991); Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc., 57 F.3d 1215, 1224 (3d Cir. 1995).

While I appreciate the Defendants' sense of frustration, I do not find it appropriate to award them attorney's fees.

Fee-shifting as a sanction based on the court's inherent power requires a finding of bad faith. See, e.g., In re Theokary, 468 B.R. 729, 748 (Bankr. E.D. Pa. 2012), aff'd sub nom. Theokary v. Shay, 2013 WL 5823849 (E.D. Pa. Oct. 29, 2013), aff'd sub nom. In re Theokary, 592 F. App'x 102 (3d Cir. 2015).

---

[17] I also am unpersuaded by the Trustee's reliance upon the fact that Debtor obtained a policy to insure the construction at Sellersville. I credit the Debtor's testimony he put the policy in place for a nominal amount of money in case Cathy decided to use Builder Pros-1 as her contractor at Sellersville. Construction began in December 2014 prior to the Debtor putting in place the policy on July 31, 2015. The Debtor cancelled the policy effective November 15, 2016. Construction was sporadic and continued through August 2018. If the Debtor had constructed Sellersville, I would expect that he would have maintained coverage for the entire construction period.

I do not find the Trustee to have pursued this litigation in bad faith. Colloquially speaking, this was a case in which there was "smoke" but no "fire." (See, e.g., Finding of Fact No. 54). Much confusion was caused by Ray's use of the Carbone Bros. name for years after the company had become defunct. And, while the Debtor is not responsible for his brother and former partner's action, he exhibited his own bad judgment by using the Carbone Bros. Harleysville Bank account and by either not acknowledging or questioning Ray's use of the Carbone Bros. name to obtain the Mt. Kirk permits.

Unfortunately, because the litigation involved assertion of alter ego claims — which are inherently fact intensive — as well as multiple natural persons and artificial entities, the Trustee necessarily had to engage in extensive discovery, which increased the costs for all involved. This was unavoidable and I will not sanction the Trustee or his counsel simply because, in the end, the Trustee failed to satisfy his burden of proof.

For these reasons, the Defendants' request for an award of attorney's fee will be denied.

## VIII.  **CONCLUSION**

The Carbone Bros. limited liability entity ceased operations in 2009, was defunct thereafter and its three (3) partners went their separate ways. Over the next decade, the partners engaged in various individual business ventures including construction contracting. While at times, the partners made occasional, questionable use of the Carbone Bros. name and bank account for reasons of convenience or laziness, their various ventures were not the stealth resurrection of Carbone Bros. Nor was Carbone Bros. or a later company he formed, Builder Pros-1, the alter ego of the bankruptcy Debtor in this case. These findings are fatal to the Trustee's efforts to pierce the corporate veil, to prove either actual or constructive fraud and recover from any of the Defendants.

Judgment in favor of the Defendants will be entered.

An appropriate order follows.

Date:  **October 17, 2022**

_____
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**